MICHAEL R. FEINBERG (89196)
mrf@ssdslaw.com
MARGO A. FEINBERG (100655)
margo@ssdslaw.com
LEORA SWERDLOW (359519)
ls@ssdslaw.com
Schwartz, Steinsapir, Dohrmann & Sommers LLP
888 West 6th Street, 12th Floor
Los Angeles, California 90017
Telephone: (323) 655-4700

Attorneys for Defendant, Local 4811
International Union, United Automobile, Aerospace, and
Agricultural Implement Workers of America

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

| | |
|---|---|
| KARIN YANIV,<br><br>        Plaintiff,<br>    v.<br>LOCAL 4811, INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,<br><br>        Defendant. | Case No. 4:25-cv-00819-AMO<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**DATE:    OCTOBER 15, 2026**<br>**TIME:    2:00 P.M.**<br>**CTRM:    1301 CLAY STREET OAKLAND, CALIFORNIA COURTROOM 5**<br><br>Trial Date: April 19, 2027<br><br>Action filed: January 24, 2025 |

# **TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES..................................................................................................4

II.    STATEMENT OF ISSUES TO BE DECIDED .................................................6

III.   STATEMENT OF THE FACTS.......................................................................7
      A. THE PARTIES .........................................................................7
      B. OCTOBER 7 ATTACK, ISRAEL'S RESPONSE, AND UNION STATEMENT........7
      C. ANTI-WAR PROTESTS ACROSS UC CAMPUSES................................................8
      D. UNION MET WITH YANIV 7 TIMES BEFORE SHE JOINED UNION ................9
      E. YANIV PARTICIPATED IN UNION MEETINGS AND THE BDS EC .................10
      F. TENSION BETWEEN YANIV AND HER CO-WORKER.....................................12

IV.    ARGUMENT ..........................................................................................13
      A. THE LEGAL STANDARD FOR SUMMARY JUDGMENT MOTIONS...............13
      B. YANIV FAILS TO STATE A CLAIM FOR HOSTILE WORK ENVIRONMENT
      (COUNT TWO) BECAUSE SUCH CLAIMS AGAINST UNIONS
      FAIL AS A MATTER OF LAW ..................................................................14
      C. YANIV FAILS TO STATE A CLAIM FOR HOSTILE WORK ENVIRONMENT
      (COUNT TWO) BECAUSE HER TERMS AND CONDITIONS OF EMPLOYMENT
      WERE UNAFFECTED ...............................................................................15
      D. ASSUMING, *ARGUENDO*, THAT YANIV CAN STATE A CLAIM AGAINST
      DEFENDANT FOR HOSTILE WORK ENVIRONMENT, IT IS ENTITLED TO
      JUDGMENT AS A MATTER OF LAW ON COUNT TWO BECAUSE
      THERE IS NO DISPUTE AS TO ANY MATERIAL FACT AND YANIV
      CANNOT ESTABLISH A PRIMA FACIE CASE ...........................................15
        a.  Anti-Zionist Speech in this Case is Not Legally Actionable Harassment Because It
        Is Not Connected to a Protected Characteristic .......................................16
        b. The Alleged Targeted Incidents, Taken Individually or Together, Were Not
        Sufficiently Severe or Pervasive so as to Support a Claim.......................20
        c. There is No Basis for the Union's Liability.............................................24
      E. YANIV FAILS TO STATE A CLAIM FOR DISCRIMINATION (COUNTS ONE
      AND THREE) BECAUSE SHE HAS NOT ALLEGED OR ESTABLISHED
      UNION DISCRIMINATION IN ITS AGENCY ROLE...............................................26
      F.  ASSUMING, *ARGUENDO*, THAT YANIV CAN STATE A DISCRIMINATION ......
      CLAIM AGAINST DEFENDANT, IT IS ENTITLED TO JUDGMENT AS A

MATTER OF LAW ON COUNTS ONE AND THREE BECAUSE THERE IS NO DISPUTE AS TO ANY MATERIAL FACT AND YANIV CANNOT ESTABLISH A PRIMA FACIE CASE..................................................................................................27

a.  Yaniv Has Not Identified Similarly Situated Members Treated More Favorably......28

G. COUNT FOUR FAILS TO STATE A CLAIM AGAINST THE UNION FOR FAILURE TO PREVENT DISCRIMINATION UNDER CAL. GOV'T CODE § 12940(k) AS THERE WAS NO UNDERLYING DISCRIMINATION OR HARASSMENT AGAINST PLAINTIFF ........................................................................30

V.    CONCLUSION.........................................................................................................30

Memorandum of Points and Authorities in Support of Defendant's MSJ; Case No. 4:25-cv-00819-AMO

**<u>TABLE OF AUTHORITIES</u>**

PAGE

**CASES**

*Andonissamy v. Hewlett-Packard Co.,* 547 F.3d 841 (7th Cir.) ................................................. 24

*Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d 654 (9th Cir. 2002)......................27-28

*Asing v. Hawaii Govt. Emps. Assn.,* Case No. 23-00335 HG-KJM, *13, 2024 U.S. Dist. LEXIS 68424 (D.Haw. Apr. 15, 2024) ................................................................................................. 28

*Badlam v. Reynolds Metals Co.*, 46 F.Supp.2d 187 (N.D.N.Y. 1999)....................................... 25

*Beck v. UFCW, Local 99,* 506 F.3d 874 (9th Cir. 2007)............................................................. 28

*Beyda v. City of Los Angeles*, 65 Cal.App.4th 511 (1998)......................................................... 23

*Blount v. Morgan Stanley et al.*, 982 F. Supp.2d 1077 (N.D.Cal. 2013).............................. 23, 28

*Braxton v. UAW*, Case No. 14-cv-12063, 2016 US Dist. LEXIS 164 (E.D.Mich. 2016) .......... 15

*Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000) ................................................. 23, 28

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)............................................................. 26

*Canel v. Art Institute of Chicago*, 824 F.Supp.3d 686 (N.D.Ill. 2026)..................................... 19

*Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, (9th Cir. 2001) ........................................... 27

*Carr v. Sanderson Farms, Inc.*, 665 Fed. Appx.335 (5th Cir. 2016) ........................................ 21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)......................................................................... 13

*Charles v. AFSCME Local 121*, Case No. 09-22279-CIV-GARBER, 2010 U.S. Dist. LEXIS 51592 (S.D.Fla. 2010)............................................................................................................ 14

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018 (9th Cir. 2006) ................................. 29

*Davis v. Team Elec. Co.*, 520 F.3d 1080 (9th Cir. 2008)........................................................... 26

*DFEH v. Lucent Techs. Inc*, 642 F.3d 728 (9th Cir. 2011) ........................................................ 30

*Dowd v. United Steelworkers, Local No. 286,* 253 F.3d 1093 (8th Cir. 2001).......................... 15

*E.E.O.C. v. Pipefitters Assn. Local Union 597*, 334 F.3d 656 (7th Cir. 2003).......................... 26

*Eliserio v. USW, Local 310*, 398 F.3d 1071 (8th Cir. 2005)..................................................... 25

*Ellison v. Brady,* 924 F.2d 872 (9th Cir. 1991)......................................................................... 25

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) ............................................................. 22

*Featherstone v. S. Calif. Permanente Med. Grp,* 10 Cal.App.5th 1150, (2017) ....................... 30

*Felber v. Yudof*, 851 F.Supp.2d 1182 (N.D.Cal. 2011)....................................................16-17, 23-24

*Galdamez v. Potter*, 415 F.3d 1015 (9th Cir. 2005) ................................................................. 22

*Garity v. APWU Nat'l Lab. Org.*, 828 F.3d 848 (9th Cir. 2016)........................................... 27, 28

*Garrett v. City Univ. of N.Y.*, No. 24-CV-9710(VSB)(RWL), 2025 U.S. Dist. LEXIS 201916 *25, fn.9 (S.D.N.Y. Dec. 10, 2025)................................................................................. 17, 18

*Gartenberg v. Cooper Union etc.*, 765 F.Supp.3d 245 (S.D.N.Y. 2025)................................... 17

*Gleason v. Mesirow Fin.*,118 F.3d 1134 (7th Cir. 1997)........................................................... 24

*Golden v. Int'l Ass'n of Firefighters*, 633 F.2d 817 (9th Cir.)................................................... 28

*Harris v. Forklift Syts.*, 510 U.S. 17 (1993); ....................................................................... 14, 22

*Healy v. James*, 408 U.S. 169 (1972)....................................................................................... 17

4

*Herrera v. SEIU Local 87*, Case No. CV 10-01888 RS, 2013 US Dist. LEXIS 205976 (N.D.Cal. 2013) .......................................................................................... 15

*Hout v City of Mansfield*, 550 F.Supp.2d 701 (N.D.Ohio. 2008) ................................ 14

*Hutchinson v. Seagate Tech.*, 147 Fed.Appx.647 (9th Cir. 2005) ........................ 23, 28

*Jones v. Bayer Healthcare*, 302 Fed. Appx. 590 (9th Cir. 2008) ................................ 28

*Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) .................................. 20

*Kasper v. City of Middletown*, 352 F.Supp.2d 216 (D.Conn. 2005) ........................... 14

*Kopamar v. Assn. of Legal Aid Attorneys*, No. 24-CV-5158 (JPO) *20, 2025 US Dist. LEXIS 134446 .................................................................................................. 19

*Kortan v. Calif. Youth Auth.*, 217 F.3d 1104 (9th Cir. 2000) ................................ 23, 24

*Landau v. Corp. of Haverford College*, 780 F.Supp.3d 548 (E.D.Pa. 2025) ........ 18, 23

*Manatt v. Bank of Am., NA*, 339 F.3d 792 (9th Cir. 2003) ..................................... 16, 23

*Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ..................... 14

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ......................................... 28

*Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986) .............................................. 22

*Metoyer v. Chassman*, 504 F.3d 919 (9th Cir. 2007) ................................................. 27

*Nguyen v. Qualcomm, Inc.*, 501 Fed.Appx. 691 (9th Cir. 2012)................................. 21

*Pereira v. Schlage Electronics*, 902 F.Supp. 1095 (N.D.Cal. 1995) ......................... 23

*Phillips v. UAW Int'l*, 149 F.Supp.3d 790 (E.D. Mich. 2016) .................................... 14

*Reed v. UAW*, 569 F.3d 576 (6th Cir. 2009) ............................................................... 27

*Robles v. Agreserves, Inc.,* 158 F.Supp.3d 952 (E.D.Cal. 2016).............................. 23

*S. A. Empresa De Viacao (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235 (9th Cir. 1982) .................................................................................................... 14

*Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990) ................................... 23

*Scott v. City of N.Y. Dept. of Corrections*, 641 F.Supp.2d 211 (S.D.N.Y. 2009)........ 16

*Snyder v. Phelps,* 562 U.S. 443 (2011) ...................................................................... 16

*St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993)................................................. 28

*Stand with Us Center for Legal Justice v. MIT*, 158 F.4th 1 (1st Cir. 2025)............... 17

*Strother v. S. Calif. Permanent Med. Grp.*, 79 F.3d 859 (9th Cir. 1996).................... 22

*Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001) ..................................... 16, 24

*Trujillo v. N. Cnty. Transit Dist.*, 63 Cal.App.4th 280 (1998)..................................... 30

*Vasquez v. Los Angeles*, 349 F.3d 634 (9th Cir. 2003) .............................................. 28

*Woods v. Graphic Communications*, 925 F.2d 1195 (9th Cir. 1991).......................... 26

**STATUTES**

42 U.S.C. 2000e-2(a)(1)................................................................................................ 14

42 U.S.C. § 2000e-(d) .................................................................................................. 26

42 U.S.C. 2000e-2(c) ................................................................................................... 14

Gov't Code, § 12940(k)........................................................................................... 26, 30

**RULES**

Fed.R.Civ.P. 56(a) ....................................................................................................... 13

Fed.R.Civ.P. 56(e) ....................................................................................................... 14

## I.    INTRODUCTION

Against a background of public debate over the tragic events of the Israel-Palestine war, this case presents a conflict between the constitutionally protected free speech rights of a Union and its members to protest Israeli military conduct and their own employer's support thereof, on the one hand, and, on the other, a sole Plaintiff who claims, without foundation, that the Union discriminated against her based on her Israeli Jewish identity by engaging in such protest. But a union that takes a political position has not, by doing so, discriminated against or created a hostile environment for its members who oppose that position.

The record contains no evidence that the Union treated the Plaintiff differently because she is an Israeli Jew, as distinct from treating her as a participant in a political disagreement. That distinction is not a narrow, technical one but is instead the distinction upon which anti-discrimination law rests. The evidence in this case provides no basis for collapsing it.

The Union, whose commitment to racial justice dates back to the Civil Rights movement, submits that Plaintiff's claims of discrimination on the basis of race, religion and/or national origin[1] rely entirely on the conflation of antisemitism and Israeli national origin discrimination with (a) an opposition to Zionism as a political ideology, which is not a race, religion or nationality as defined by either Title VII or California's Fair Employment and Housing Act, and/or (b) opposition to Israeli conduct in Gaza and United States support thereof. Therefore, summary judgment is proper on all of Plaintiff's claims.

## II.    STATEMENT OF ISSUES TO BE DECIDED

1.  Whether there is any genuine issue of material fact in dispute.

2.  Whether Plaintiff has failed to state a claim for hostile work environment under Title VII against Defendant Union as a matter of law.

3.  Whether Plaintiff lacks sufficient evidence to establish the elements of a prima facie case for hostile work environment under Title VII against Defendant Union.

4.  Whether Plaintiff has failed to state a claim for disparate treatment under Title VII

---

[1] Plaintiff interchangeably alleges that she was subject to discrimination based on her Israeli national origin alone, her Jewish religion alone, *and* the intersection of the two - without distinction. However, because she cannot establish a prima facie case under Title VII or FEHA under any one of these three bases, the Union need not address this defect in this motion.

or FEHA against Defendant Union as a matter of law.

5.  Whether Plaintiff lacks sufficient evidence to establish the elements of a prima facie case for disparate treatment under Title VII or FEHA against Defendant Union.

6.  Whether Plaintiff has failed to state a claim under FEHA for failure to prevent discrimination on account of religion, race, and national origin.

## III.    STATEMENT OF THE FACTS

### A.  THE PARTIES

Defendant UAW Local 4811 (Union) represents more than 60,000 Academic Student Employees, Post Docs, Academic Researchers, Student Services & Advising Professionals, and Research & Public Service Professionals across the University of California (UC) system. (Declaration of Rafael Jaime, ¶¶ 1-2)[2] Plaintiff Karen Yaniv (Yaniv) began her employment as a postdoctoral (Post Doc) employee in UC Berkeley's Department of Plant and Microbial Biology in January 2022. (Deposition of Karin Yaniv, 15:17-16:24) Yaniv became a Union member in the Post-Doc bargaining unit on January 17, 2024.[3] (Jaime Decl., ¶ 12)

### B.  OCTOBER 7 ATTACK, ISRAEL'S RESPONSE, AND UNION STATEMENT

On October 7, 2023, Hamas led a coordinated attack on Israel which killed approximately 1,200 Israeli citizens, making it the deadliest day for Israel since its founding. More than 240 people were taken hostage during the attack. The Israeli military retaliated within hours by launching air strikes and ordering a blockade of food and fuel to the Gaza strip. *See,* Request for Judicial Notice, Exs. A and B.

On October 13, 2023, the UAW Local 2865 Executive Board voted to issue a statement entitled, "Demand a Ceasefire and an End to the Occupation of Palestine." ("October 13, 2023 Statement") (Jaime Decl., ¶ 3, Ex. A)

On October 27, 2023, the Israel Defense Forces launched a large-scale military invasion inside the Gaza Strip. Since October 7, 2023, Israeli military forces have killed over 70,000 Palestinians, most of whom were civilians, in a campaign characterized as a genocide by

---

[2] Depositions referred to herein are attached as exhibits to the Michael R. Feinberg Declaration.
[3] Yaniv joined UAW Local 5810. She remained a member of UAW Local 5810 until the amalgamation of UAW Locals 5810 and 2865 into UAW Local 4811, on May 15, 2024.

international legal bodies, genocide scholars and Israeli human rights organizations. *See,* Request for Judicial Notice, Exs. A and B.

### C. ANTI-WAR PROTESTS ACROSS UC CAMPUSES

Yaniv broadly and falsely alleges that the Union supported antisemitic and violent "Pro-Palestine" protests at UC Berkeley.[4] She alleges that at these protests, which she does not claim to have witnessed, "protesters repeated anti-Israel chants and became physically violent, attacking Jewish and Israeli students."(Dkt. No. 1, ¶¶ 23, 27) Yaniv does not know if Local 4811 supported or encouraged the alleged protests. (Yaniv Depo., 28:2-7)

Yaniv alleges that an October 2023 Pro-Palestine rally at UCLA was advertised "with posters depicting Israel engulfed in flames and men wielding AK-47 assault rifles and slingshots." (Dkt. No. 1, ¶ 24) There is no evidence that Local 4811 (and Locals 2865 or 5810 for that matter) organized this rally or authorized the alleged posters. (*See*, Jaime Decl,, ¶ 4) Yaniv also alleges that protestors chanted, "Intifada revolution!" – though she only learned about this from an unknown person, did not see or hear such chants, and has no personal knowledge as to whether Union agents engaged in such chants. (Yaniv Depo., 32:6-33:5)

Yaniv also alleges, although she does not claim to have been present, that at a November 2023 rally*, either at UCLA or UC Berkeley*, "Union officials" chanted "antisemitic rallying cries," including, "From the river to the sea, Palestine will be free." (Dkt. No. 1, ¶ 26) Yaniv learned this from an unidentified graduate student or from still images on social media with no accompanying sound. (Yaniv Depo., 38:15-39:8-9; 169:3-19; 169:15, 17) She alleges that this rally was advertised with the statement "UCLA condemns Zionism" which she labels antisemitic. (Dkt. No. 1, ¶ 25) There is no evidence that the Union organized this rally or authorized its advertisements. (*See*, Jaime Decl., ¶ 5)

Yaniv alleges that "in 2024, protestors at UC Berkeley blocked entrances, marched through dormitories and engaged in antisemitic chants." (Dkt. No. 1, ¶ 27) She describes a protest on February 26, 2024 wherein protestors "broke windows, harassed and assaulted

---

[4] Yaniv describes "Pro-Palestine" protests as "antisemitic" over 26 times in her Complaint.

attendees, and forced UCB to evacuate the building." There is no evidence that the Union encouraged, authorized or was responsible in any way for such conduct. (Jaime Decl., ¶ 6; *See* Tanzil Chowdhury Declaration, ¶ 4) Yaniv was not present at this protest and was not even in the building at the time it occurred. (Yaniv Depo., 43:9-44:5) Yaniv further alleges that on an unspecified date, a sign that once read "UC Stands Against Hate" was changed to "UC Stands Against Zionism." (Dkt. No. 1, ¶ 27) There is no evidence that the Union encouraged, authorized or was responsible for such conduct. (Jaime Decl., ¶ 8; Chowdhury Decl., ¶ 5)

Finally, without factual support, Yaniv claims that Union leadership established a "Union Village" as part of a larger UC Berkeley protest encampment, in the vicinity of banners and signs containing antisemitic symbolism and rhetoric. (Dkt. No. 1, ¶ 30) However, contrary to the Complaint, Yaniv testified, "I don't know who established [the] Union Village." (Yaniv Depo., 51:16) In fact, the Union did not authorize or form the so-called "Union Village." Rank and file members of the Union did so on their own. (Chowdhury Depo., 44:24-45:1)

### D.  UNION MET WITH YANIV 7 TIMES BEFORE SHE JOINED UNION

In November 2023, Yaniv and Israeli graduate student Neta Gazit Shimoni met with Union Head Stewards Iris Rosenblum-Sellers and Rikhav Shah, and Staff Organizer Mia Wachtel Antezzo to discuss their concerns about the Union's October 13, 2023 Statement. In subsequent emails, Shimoni repeatedly expressed her gratitude to Union officials for engaging in a thoughtful dialogue with her and her colleagues. (Jaime Decl., ¶ 9, Ex. B)

Yaniv and others formed a group called UC Against Hate and sent Union officials an email on December 13, 2023 about the Union's statements on Israel/Palestine. (Dkt. No. 1, ¶¶ 35, 36) In December 2023, Laura Cook, Recording Secretary of Local 5810, responded and participated in more than 7 in-person meetings with Yaniv to discuss the group's concerns, even before Yaniv joined the Union. (Dkt. No. 1, ¶¶ 39, 41; Jaime Decl., ¶ 10; Ex. C) During this time, Yaniv also engaged in reciprocal email communications with Cook, Staff Organizer David Weitz, and Sarah Arveson, Vice President of Local 5810. (Jaime Decl., ¶ 10; Ex. C)

On January 19, 2024, Yaniv, Shimoni and 24 UC Against Hate members met with Union Executive Board members, including Union President Rafael Jaime. (Jaime Decl., ¶ 11)

UC Against Hate members spoke about the Union's October 13 Statement and support for Pro-Palestine protests . (Yaniv Depo., 73: 3-9; 73:18-24) In a subsequent email, Shimoni expressed her gratitude to the Union officials, writing: "Thanks again for your support in our community and helping us get their voice heard again." (Shimoni Depo., Ex. 4)

### E.  YANIV PARTICIPATED IN UNION MEETINGS AND THE BDS EC

On January 31, 2024, the Union held a UC Berkeley Monthly Membership Meeting (MMM). (Dkt. No. 1, ¶ 43) The meeting's agenda, which was not sent to any rank-and-file Union members prior to the meeting, stated that member ▮▮▮▮▮▮▮▮[5] would present a resolution, "Committing to a Labor Strategy towards Boycott, Divestment and Sanctions at the University of California." ("January 2024 BDS Resolution") (Yaniv Depo., Ex. 3; Chowdhury ¶ 6) The January 2024 BDS Resolution, co-authored by rank-and-file Union members ▮▮▮ and ▮▮▮▮▮▮, was not an official Union resolution. (Jaime Decl., ¶¶ 14-15; *see*, Deposition of ▮▮▮▮▮▮, 20:17-20, Ex. 1) In pertinent part, the Resolution called for the establishment of a rank-and-file BDS Exploratory Committee to investigate and document the UC's current financial and labor ties to the occupation and weapons trade with Israel. (▮▮▮ Depo., Ex. 1. 2nd page) Union members at the MMM voted to pass the resolution with only 3 members voting against it, including Yaniv. (Dkt. # 1 ¶ 53; Chowdhury Decl., ¶ 7, Ex. A)

Yaniv and Shimoni joined the BDS Exploratory Committee (EC) called for by the Resolution, and attended its first meeting on February 12, 2024. (Dkt. # 1 ¶56) During this meeting, Yaniv expressed her opposition to BDS and to the Committee's mission. (▮▮▮ Depo., 52:14-25; 53:1-3; 73:24-25; 74:1-5;11-13) Meeting participants divided themselves into 3 working groups or subcommittees: Academic and Public-Private Partnerships, Investments, and Structure Mapping. (Dkt. # 1 ¶ 57; ▮▮▮ Depo., Ex. 8) ▮▮▮, ▮▮▮ and ▮▮▮▮▮ volunteered as "bottom liners" for these groups -  they were not elected or appointed by the Union. (Dkt. # 1, ¶ 58; ▮▮▮ Depo., 81:3-20) ▮▮▮, ▮▮▮ and ▮▮▮ have never held

---

[5] The name of individual rank-and-file Union members involved in Pro-Palestinian political advocacy, which the Union seeks to have placed under seal have been redacted pursuant to Civil Local Rule 79-5(e)(1).

*any* elected, appointed, or staff positions with the Union. (Jaime Decl., ¶16)

On February 14, 2024, Yaniv contacted ████ to request to participate in the Structure Subcommittee. ████ responded on February 16, 2024, instructing her on how to contribute to the group's meeting notes. (████ Depo., Ex. 8) That day, ████ also emailed attendees of the first EC meeting to request they fill out an online form to join a Subcommittee. (████ Depo., 66:7-113; Ex. 8) Yaniv did not fill out this form. (Yaniv Depo., 105:20-22)

On February 24, 2024, ████ informed Yaniv that the Structure Subcommittee was working "asynchronously" (*i.e.,* without meetings). (Dkt. # 1, ¶ 62; ████ Depo., Ex. 8; Yaniv Depo., 157:19-20) ████ directed Yaniv to a Google Drive folder where documents were being collected and gave her full access to the Drive. (Dkt. # 1, ¶ 62; ████ Depo., Ex. 8) There is no evidence that any Subcommittee member other than Yaniv was informed of its work plans before she was, let alone evidence that such an individual was non-Jewish and/or non-Israeli. Yaniv admits that after ████' email, she had access to the Google Drive and all materials therein, including a running list of research action items, *although she never made any entries to it*. (Yaniv Depo., 99:11-24; 108:12-19; ████ Depo., 64:10-25; 65:1-2)

On February 26, 2024, Yaniv attended a meeting of the EC, at which ██ a rank-and-file Union member, urged others to go to a protest to "disrupt an evil Zionist speaking." (Dkt. # 1, ¶ 29, Ex. C; Jaime Decl., ¶ 7; ████ Depo., 111:15-16) Yaniv did not actually hear those words spoken. (Yaniv Depo., 17:14-19) The Union did not support or encourage the protest action nor the conduct alleged in the Complaint at ¶ 28. (Jaime Decl., ¶ 6)

Between meetings of the EC, its members conducted open-source research into the UC's ties to the Israeli government, tracking research tasks in a shared spreadsheet. (████ Depo., 45:2-6; 65:13-25; 66:1-5; 68:14-21; Yaniv Depo., 99:20-24) Yaniv did not contribute any research or writing. (Yaniv Depo., 99:20-24) Sometime after February 2024, Yaniv asked Weitz why she could not participate in the Structure Subcommittee and claims that Weitz "acknowledged" that she had been intentionally excluded. (Dkt. # 1, ¶¶ 65-66) There is no evidence of any such acknowledgement. (Deposition of David Weitz, 84:2-10)

On or about March 6, 2024, the Union held a UC Berkeley Monthly Membership

Meeting (MMM) which Yaniv and Shimoni attended via Zoom. Chowdhury was the meeting Chair. At this meeting, Shimoni made several comments about the January 2024 BDS Resolution, general "Union-led actions" and the October 13th Statement. (Shimoni Depo., 101:13-102:5, Ex. 5) The first time she spoke, she heard unidentified Union members laugh and boo. (Shimoni Depo., 43:21-25) In response, Chowdhury reminded the crowd to be respectful of others, and to quiet down. (Shimoni Depo., 44:25; 45:1-5; 45:9-11; Chowdhury Decl., ¶ 9)  Between April 1 and 6, 2024, Yaniv and Chowdhury exchanged emails addressing various concerns. (Dkt. # 1, ¶¶ 88, 90, 91, 141, 159, 164; 165; Chowdhury Decl., ¶ 10, Ex. C )

On April 3, 2024, the Union held a UC Berkeley MMM, which Yaniv attended over Zoom, wherein campus members voted to pass a revised BDS resolution ("April 2024 BDS Resolution"). Chowdhury was the meeting Chair. (Dkt. # 1, ¶92;  Chowdhury Decl., ¶ 12, Ex. D)  During this meeting, Israeli member, Yael Nidam, expressed her disagreement with information provided by other Union members about BDS. (Nidam Depo., 21:19-25) Yaniv alleges that at one point while Nidam spoke, Union members laughed, interrupted her, and one wrote "LMFAO" in the Zoom chat - though Yaniv was unaware of the term's meaning at the time.[6] (Dkt. # 1, ¶96; Yaniv Depo. 124: 7-8) Immediately following, Chowdhury reminded meeting participants to respect the Code of Conduct and refrain from laughter and extraneous comments while members spoke. (Yaniv Depo., 127:10-12; Chowdhury Decl., ¶ 12) There were no additional meeting disruptions. (Yaniv Depo., 127:20-24) After the meeting, Yaniv wrote to the Union and Chowdhury responded the next day. (Chowdhury Decl., ¶14, Ex. E)

In November 2024, the Exploratory Committee released a draft report of "Who Rules the UC?" Other than via an email link inserted at the bottom of a UC Berkeley MMM agenda packet, the report was not shared with Union members. (█████ Depo., Ex. 13, 105:10-12)

### F.  TENSION BETWEEN YANIV AND HER CO-WORKER

After the January 31, 2024 MMM, Yaniv tried to speak with a co-worker in her Lab, Anjali McNeil, who is a Union Steward for the Academic Student Employee bargaining unit.

---

[6] Yaniv also admits she just speculating as to whether Union officials were aware that someone had written "LMFAO" in the Zoom chat. (Yaniv Depo., 125:25; 126:1-20)

According to Yaniv, McNeil stated that she didn't want to talk with her. (Yaniv Depo., 134:11-14) Yaniv testified that she felt that working alongside an individual who "aligns" with "things" that she "found violent or anti-Semitic or exclusion[ary]" created a hostile work environment for her. (Yaniv Depo., 138:18-139:1) Yaniv could not show that McNeil aligned herself with violence, antisemitic messages, or exclusion, though she raised two incidents in her deposition that she felt indicated hostility. First, Yaniv received a UC Berkeley WarnMe email that there had been firebombing outside Koshland Hall, where their lab is located. (Yaniv Depo., 152:18-153:2) According to Yaniv, rather than acknowledging the effect such an event would have on her, McNeil said that she looked outside when she got the email, did not see anything and stated that the event was "nothing." (Yaniv Depo., 154:9-13)

Second, Yaniv ran an experiment where she placed bacterial cultures in an incubator. McNeil wanted to run her own experiment, at a lower temperature in the incubator. So, without advising Yaniv, McNeil lowered the incubator temperature, killing Yaniv's samples. Later, at the direction of the Lab's Principal Investigator (PI), McNeil sent Yaniv a written apology. As this occurred after the April 1, 2024 MMM, Yaniv testified that she "connect[ed] this anti-Israel sentiment to why [McNeil] felt that she's above me, her experiments are more important, and why she felt like she can do it to me." (Yaniv Depo., 147:14-151:25)

## IV.    ARGUMENT

### A.  THE LEGAL STANDARD FOR SUMMARY JUDGMENT MOTIONS

Summary judgment is appropriate if the pleadings, admissible discovery and affidavits, viewed in the light most favorable to the nonmoving party show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). There is no genuine issue of material fact if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* This is because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. The moving party need not disprove the other party's case. *Id.*, at 325.

13

To prevail, the non-moving party may not rely solely on pleadings or conclusory allegations unsupported by facts. Fed.R.Civ.P. 56(e). It "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S. A. Empresa De Viacao (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

**B. YANIV FAILS TO STATE A CLAIM FOR HOSTILE WORK ENVIRONMENT (COUNT TWO) BECAUSE SUCH CLAIMS AGAINST UNIONS FAIL AS A MATTER OF LAW**

Title VII's hostile work environment theory of employment discrimination stems from the language of 42 U.S.C. 2000e-2(a)(1) prohibiting *employers* from discriminating with respect to "compensation, terms, conditions, or privileges of employment." *Harris v. Forklift Syts.*, 510 U.S. 17 (1993); *Phillips v. UAW Int'l*, 149 F.Supp.3d 790 (E.D. Mich. 2016), *aff'd on other grounds*, 854 F.3d 323 (6th Cir. 2017). To establish a *prima facie* case, an employee must show that she was subject to unwelcome harassment based on her membership in a protected class which was so severe or pervasive as to alter a term, condition, or privilege of her employment and create an abusive work environment. *Harris,* 510 U.S. at 22.

By contrast, 42 U.S.C. 2000e-2(c), which proscribes unlawful employment practices for *unions*, has no parallel language prohibiting a union from discriminating against its members with respect to "terms and conditions of employment." *Kasper v. City of Middletown*, 352 F.Supp.2d 216 (D.Conn. 2005) Therefore, courts do not impose liability on unions under a hostile work environment theory in the same manner they do for employers. *See, e.g., Phillips*, 149 F.Supp.3d at 801; *Hout v City of Mansfield*, 550 F.Supp.2d 701, 742 (N.D.Ohio. 2008)(no union liability for hostile work environment because such claims "emerge from the language of 42 U.S.C. § 2000e-2(a)(1) specifically attaching liability to employers' discriminatory actions."); *Charles v. AFSCME Local 121*, Case No. 09-22279-CIV-GARBER, 2010 U.S. Dist. LEXIS 51592 (S.D.Fla. 2010)(hostile environment claim based on union leaders' conduct at a union meeting fails as a matter of law) As a result, Yaniv cannot state a claim against the Union under 42 U.S.C. 2000e-2(c), for hostile work environment.

14

### C. YANIV FAILS TO STATE A CLAIM FOR HOSTILE WORK ENVIRONMENT (COUNT TWO) BECAUSE HER TERMS AND CONDITIONS OF EMPLOYMENT WERE UNAFFECTED

Even where courts impose liability on unions under a hostile work environment theory in the context of internal union affairs, they will only do so where the plaintiff's *working conditions* were impacted. For example, in *Dowd v. United Steelworkers, Local No. 286,* 253 F.3d 1093 (8th Cir. 2001), the Court allowed plaintiffs to pursue a hostile work environment claim against their union where members and an elected steward shouted racist epithets daily at plaintiffs as they crossed a picket line. Strikebreakers were threatened with violence as they drove in and out of the plant. Union supporters were "in physical proximity to the plant, and arguably perpetrated with the intention to intimidate and to affect the working atmosphere inside the plant." *Id*. at 1102. Therefore, "…a reasonable juror could have determined that the racial abuse hurled at the plaintiffs as they attempted to *go to and from work* was 'sufficiently severe or pervasive to alter the conditions of [their] *employment* and create an abusive *working* environment.'" 253 F.3d at 1103 (emphasis added). *Compare*, *Herrera v. SEIU Local 87*, Case No. CV 10-01888 RS, 2013 US Dist. LEXIS 205976 (N.D.Cal. 2013)(granting summary judgment against Hispanic janitorial union members on their hostile work environment claim against their union based on racist comments made by union officials in their presence *in the union hall*: "[t]he union [hall] is not plaintiffs' working environment. Plaintiffs have not shown any facts that statements by the union leaders altered the conditions of their *employment* at the janitorial companies"); and *Braxton v. UAW*, Case No. 14-cv-12063, 2016 US Dist. LEXIS 164 (E.D.Mich. 2016)(hostile environment claim against union failed as a matter of law because it was not plaintiff's workplace, but even if he had a claim despite this defect, he could not show that harassment during grievance review and union meetings affected his *employment* at the casino where he worked.)

Yaniv is employed as a post-doc at UC Berkeley. Because she has not alleged that she was subjected to harassment which altered the terms, conditions, or privileges of her employment there, her hostile work environment claim must fail as a matter of law.

### D. ASSUMING, *ARGUENDO*, THAT YANIV CAN STATE A CLAIM AGAINST

15

**DEFENDANT FOR HOSTILE WORK ENVIRONMENT, IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNT TWO BECAUSE THERE IS NO DISPUTE AS TO ANY MATERIAL FACT AND YANIV CANNOT ESTABLISH A PRIMA FACIE CASE**

Assuming, *arguendo*, that Yaniv can state a claim against the Union for hostile work environment away from her worksite, she must still show that 1) she belongs to a protected class; 2) was subjected to unwelcome harassment based on her membership in that class[7]; and 3) the harassment was sufficiently severe and pervasive so as to alter the terms, conditions or privileges of her union membership. *Scott v. City of N.Y. Dept. of Corrections*, 641 F.Supp.2d 211 (S.D.N.Y. 2009) If, as here, she cannot do so, summary judgment must be granted in the Union's favor. *Manatt v. Bank of Am., NA*, 339 F.3d 792, 799 (9th Cir. 2003) Summary judgment must also be granted when the union establishes an absolute defense to liability as a matter of law. *Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001) (establishing liability standard for co-worker harassment).

**a. Anti-Zionist Speech in this Case is Not Legally Actionable Harassment Because It Is Not Connected to a Protected Characteristic**

Yaniv's hostile work environment claim is supported almost exclusively by allegations involving the Union's and/or its members' opposition to Israeli military conduct in Gaza, which took the form of protests, written statements, and research work related to BDS. She alleges that the Union's "alignment" with such "anti-Israel" activity "fostered an atmosphere of hostility and terror for Israeli Jews" making her feel "ostracized, targeted and unsafe" (Dkt. No. 1,, ¶¶ 22-34, 44, 47, 50-51, 57, 69-71, 73-81, 83, 85, 92-94, 113), although, she admits that she did not feel personally targeted as a Jew or as an Israeli. (Yaniv Depo., 59:2-5)

Where, as here, plaintiff's harassment allegations involve speech on matters of "public concern," such speech is "entitled to 'special protection' under the First Amendment" and generally "cannot be restricted simply because it is upsetting or arouses contempt." *Snyder v. Phelps,* 562 U.S. 443, 453, 458 (2011); *see also Felber v. Yudof*, 851 F.Supp.2d 1182 (N.D.Cal. 2011)(Jewish plaintiffs failed to state claim for harassment based on exposure to anti-Israel

---

[7] Title VII prohibits employment discrimination based on, "race, color, religion, sex, or national origin." Zionism is a political ideology which is not a protected class under Title VII.

protests at UC Berkeley, where protestors carried signs equating Israelis to Nazis and an Israeli flag with a swastika; such protests were "pure political speech and expressive conduct, in a public setting, regarding matters of public concern which is entitled to special protection under the First Amendment.") Notably, free speech protection is "nowhere more vital than in the community of American schools." *Healy v. James*, 408 U.S. 169, 180 (1972).

In assessing whether First Amendment protected speech constitutes harassment under Title VII, courts distinguish between speech on matters of public concern "directed to the community at large through generally accepted methods of communication," as opposed to "targeted, personal harassment" aimed at a particular individual or group of people. While the latter may be actionable harassment, the former is not. *Gartenberg v. Cooper Union etc.*, 765 F.Supp.3d 245, 265 (S.D.N.Y. 2025).[8] Notably, "a plaintiff cannot transform political speech into actionable harassment by alleging, in a conclusory fashion as here, that the protected expression was targeted or otherwise actionable." *Garrett v. City Univ. of N.Y.*, No. 24-CV-9710(VSB)(RWL), 2025 U.S. Dist. LEXIS 201916 *25, fn.9 (S.D.N.Y. Dec. 10, 2025).

In the context of the Israeli military's assault on the Palestinian people since October 7, 2023, courts have held that anti-war campus protests are "classically political speech" where they are directed towards the State conduct or policy of Israel and/or of the United States. *Stand with Us Center for Legal Justice v. MIT*, 158 F.4th 1 (1st Cir. 2025). Likewise, "the dissemination of flyers, open letters, mass emails, and social media posts on matters of public concern that [are] not targeted at any particular individual qualify as core political speech outside the scope of Title VII." *Garrett*, *supra*, at *31. This reflect the key tenet of the hostile environment theory – that actionable harassment must be based on a protected characteristic.

In *Gartenberg,* the court found that "pure speech on matters of public concern" included an October 2023 demonstration where protestors chanted, "resistance is justified when people are occupied," "it is right to rebel, Israel go to Hell," "there is only one solution:

---

[8] See also *Rodriguez v. Maricopa Cnty. Cmty. Coll. Dist.,* 605 F.3d 703, 710 (9th Cir. 2010) (analyzing the intersection of the First Amendment and a Title VII hostile environment claim and expressing "doubt that a college professor's expression on a matter of public concern, directed to the college community, could *ever* constitute unlawful harassment").

intifada revolution," and "from the river to the sea, Palestine will be free." It ruled that flyers inviting students to "[c]elebrate the 36th anniversary of the First Intifada" and to "grieve and honor all those killed by decades of Israeli occupation and imperial violence," and an art display that included the words "Resist Colonialism From The Bronx To Palestine 'By Any Means Necessary'" was not harassment based on a protected characteristic, because there was "no factual support for [the] assertion that any of [the protest] messages were intended to target particular Jewish students, as opposed to communicate a political message to the Cooper Union community at large." *Id*., at 271. Instead, "the content of the protest slogans, fliers, and other expressions…related to the ongoing Israeli-Palestinian conflict and touched upon topics like Zionism, colonialism, and racism." *Id*., at 270.

The *Gartenberg* court contrasted these incidents with conduct it *did* establish was "targeted" harassment, where protestors broke into the library, in which a group of students wearing "visibly Jewish attire" were congregated, banged loudly on glass, chanted, and waived Palestinian flags, which led administrators to tell the group to hide or leave. *See also Garrett*, *supra, at \*24* (explaining that a protest "plausibly crossed the line into targeted harassment" where students physically assaulted a protestor and removed his pro-Israel sign from him)

In *Stand with Us*, the Court ruled that campus protests of Israel's military incursion could not support a harassment claim, explaining that "by gathering together in groups on campus, disrupting campus tranquility, and impeding travel for many students, the protestors did not render their speech antisemitic, much less unprotected." In so ruling, the Court declined to adopt the plaintiff's view that pro-Palestine and/or anti-Zionist chants like "from the river to the Sea, Palestine will be free" and "intifada revolution" were antisemitic, explaining that absence of a consensus on this issue – including among Jews, "reflects ongoing debate as to the relationship between anti-Zionism and antisemitism – debate that our constitutional scheme resolves through discourse, not judicial fiat." 158 F.4[th] at 17. *See* also *Landau v. Corp. of Haverford College*, 780 F.Supp.3d 548, 555 (E.D.Pa. 2025)(rejecting the proposition that "anti-Israel speech is intrinsically antisemitic" because "reasonable people acting in good faith can challenge decisions of the Israeli government without harboring antisemitic views") Crucially,

18

the *Stand with Us* Court did not shield otherwise discriminatory speech behind a façade of First Amendment protection. Instead, the Court held that the protestors' criticism of U.S. foreign policy and Israeli militarism was not harassment *based on a protected characteristic.*

Similarly in *Canel v. Art Institute of Chicago*, 824 F.Supp.3d 686, 706 (N.D.Ill. 2026), the court ruled that chants ("from the river to the sea, Palestine will be free," and "resistance is justified when people are occupied"), the phrase "#AlAqsaFlood," an open letter describing Zionism as "a political ideology predicated on colonial theft and destruction," and a violent protest at a campus museum were pure political expression where "plaintiff has not plausibly alleged that the flyers, chants, slogans, social media posts, vigils, and protests … were driven by antisemitism or anti-Israeli sentiment, rather than political points of view criticizing the Israeli government and/or advocating for Palestinians." Here too, the speech and accompanying protest activity was not "based on" a protected characteristic.

Courts have also ruled that statements in support of BDS are non-discriminatory political expression, warning that, "reading antidiscrimination laws to prohibit the voicing of views critical of a foreign state, or support thereof, would raise serious doubts about their constitutionality." *Kopamar v. Assn. of Legal Aid Attorneys*, No. 24-CV-5158 (JPO) *20, 2025 US Dist. LEXIS 134446 (holding union's BDS resolution criticizing Israel "falls squarely within the realm of protected political speech" where it "neither identifies nor targets any individual or group *on the basis of race, ethnicity, religion or nationality*"). (Emphasis added.)

Accordingly, the following written material and organizing activity fall squarely within the realm of "pure political speech" and cannot be used to support Yaniv's hostile work environment claim (nor to provide it with context): 1) the Union's October 13, 2023 Statement; 2) the January 2024 BDS Resolution; 3) the April 2024 BDS Resolution; 4) the Report, "Who Rules the University of California?"; 5) chants of "from the river to the sea, Palestine will be free" and "There is only one solution (intifada revolution!)" 6) the establishment of a "Union Village" within a Pro-Palestine protest encampment and the presence of a Union member at this encampment; 7) a sign reading, "UC Stands Against Zionism"; 8) the exhortation by a rank-and-file Union member during a February 26, 2024 meeting of the BDS Exploratory

Committee, to "come disrupt an evil Zionist," referencing the protest of a lecture by a right-wing Israeli government, and the protest that took place; and 9) a December 2023 BDS Resolution at a UC Santa Barbara campus MMM.

These statements are not based on a protected characteristic. *Jones v. UPS Ground Freight*, 683 F.3d 1283 (11th Cir. 2012) ("only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis") Each is directed towards the State of Israel, its government and military conduct, and the UC's specific financial and institutional ties to the State carrying out this conduct. Each is "related to the ongoing Israeli-Palestinian conflict," touch upon topics including, "Zionism, colonialism, and racism" and do not constitute targeted harassment based on membership in a protected class.[9]

### b. The Alleged Targeted Incidents, Taken Individually or Together, Were Not Sufficiently Severe or Pervasive so as to Support a Claim

Yaniv did not feel "personally targeted" by the Union nor its members as a Jew or Israeli, nor did anyone make a comment to her about her Israeli heritage. (Yaniv Depo., 57:17-22; 58:8-10; 59:2-6) Nevertheless, she alleges that the following incidents created a hostile environment for her: 1) in an April 2024 Union membership meeting, Union members laughed and one wrote "LMFAO" when Israeli Union member, Yael Nidam, spoke in opposition to a proposed BDS Resolution; 2) in a meeting on March 6, 2024, Union members laughed after Israeli member, Neta Gazit Shimoni, spoke to criticize the January 2024 BDS Resolution and the Union's October 13th statement; 3) Yaniv's co-worker, Anjali McNeil, inadvertently changed the temperature on Yaniv's incubator, leading her bacterial culture to become unusable[10]; 4) after a firebombing incident was reported outside of the building where Yaniv

---

[9] There are additional hurdles Yaniv would have to clear to establish that the events listed support her hostile environment claim, or provide context for such a claim: First, she must establish that the *Union* is liable for its members' protected free speech activity, which she has not done. Second, she must establish how events which she did not personally witness, and/or was not even aware of, created an objectively hostile environment for her. However, because these events are plainly non-targeted political speech with no connection to a protected characteristic, the Union need not address these arguments here.

[10] The Complaint merely alleges that "Yaniv works in a lab with a Union official," and then makes the conclusory allegation that "the presence of these Union officials further creates a pervasive, hostile environment where the Union's discriminatory conduct invades the workspace." (¶ 114)

worked, McNeil stated that she went outside and did not see anything happening[11], and 5) Yaniv was not added to a group chat with members of the Structure Subcommittee.

First, there is no evidence that any one of these incidents occurred "because" of Yaniv or her colleagues' Israeli Jewish identity. But even assuming there were, these incidents – separately or together –are objectively not so severe or pervasive as to have altered the "terms, conditions or privileges" of Yaniv's Union membership.

### i.    None of the Incidents Are Connected to a Protected Characteristic

A plaintiff bringing a hostile environment claim must demonstrate that she was subjected to unwelcome harassment "based on her membership in a protected class." Thus, "[a] bare allegation of harassment, unrelated to membership in any protected class, cannot form the basis of a Title VII claim." *Carr v. Sanderson Farms, Inc.*, 665 Fed. Appx.335 (5th Cir. 2016); *see also Nguyen v. Qualcomm, Inc.*, 501 Fed.Appx. 691 (9th Cir. 2012)(summary judgment affirmed where plaintiff relied on self-serving statements in alleging that the reason her coworkers spoke negatively about her and laughed at her was *because* she was Vietnamese, nor was this severe or pervasive). Because Plaintiff has no evidence that any of these incidents occurred because of her identity or that of her colleagues, they must be disregarded.

First, Yaniv alleges that at two Union meetings, members laughed after her Israeli colleagues spoke out in opposition to the Union's October 13th Statement and January 2024 BDS Resolution. However, she has produced no evidence that these members laughed because of their Israeli Jewish identities rather than in disagreement with their political positions.[12]

Second, Yaniv has no evidence that the incubator incident or McNeil's comment on the

---

The lab incident she alleged for the first time in her deposition falls outside the scope of the Complaint. We reserve the right to object to such "evidence" at trial.

[11] *Id.*

[12] For example, Nidam testified that she spoke to contest information about BDS that Union members had earlier presented: "So basically to support their cause of boycotting Israeli institutions, they provided information to the audience. And I found that information inaccurate and misleading, so I provided facts to confront their narrative. And then whenever I did, they laughed at me." (Nidam Depo., 21:23-25) Ms. Shimoni testified that Union members laughed when she spoke in response to the proposed BDS Resolution and the Union's October 13 Statement. (Shimoni Depo., 101:18-25)

firebombing had any connection to Yaniv's Israeli Jewish identity.[13] There is no evidence that McNeil's conduct towards Yaniv was based on her identity, nor does Yaniv even believe this.

Finally, ▮▮▮ testified that he did not add Yaniv to the Subcommittee group chat because she did not provide him with her phone number (▮▮▮ Depo., 61:8-17); and, because during their first meeting, Yaniv expressed opposition to the BDS movement and to the Subcommittee's mission. (▮▮▮ Depo., 72:13-16, 19-22; 73:1-5, 16-19, 25) There is no evidence that any member who shared the Subcommittee's aims, whether Israeli, Jewish or otherwise, faced similar exclusion. Nor is there evidence that ▮▮▮ did *not* exclude non-Israeli and/or non-Jewish members similarly opposed to the group's mission.

### ii.    Isolated "Stray Remarks" and Ordinary Union Friction Did Not Alter the Terms and Conditions of Yaniv's Union Membership

Unwelcome harassment is "severe or pervasive" where a plaintiff's environment is both objectively and subjectively hostile. *Galdamez v. Potter*, 415 F.3d 1015, 1023 (9th Cir. 2005) In assessing hostility, courts consider the "totality of the circumstances" which includes "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance." *Harris v. Forklift Sys., supra*, 510 U.S. at 23. A hostile work environment is one that is "permeated with 'discriminatory intimidation, ridicule, and insult'." *Id.* at 21 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)).

Title VII is not a "general civility code," so courts will not find "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" to be severe or pervasive. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)("discourtesy or rudeness" must not be "confused with racial harassment"). Nor does mere ostracism in the workplace amount to a hostile environment. *Strother v. S. Calif. Permanente Med. Grp.*, 79 F.3d 859, 869 (9th Cir. 1996) Exclusion from meetings or work-related social events will not contribute to a hostile work environment, absent evidence that such exclusion impacted terms and conditions of a

---

[13] When asked what she *believed* McNeil's motive was to damage her experiment, Plaintiff testified, "To me, it felt like she doesn't think my stuff are important to her…. That maybe she's doing it to me because of who I am and she wouldn't do that to any other lab member, but she did it to me." (Yaniv Depo., 148:12-13, 22-24) When pressed to explain McNeil's motive, Yaniv stated, "The motive is also for Anjali to be truthful and say why." (156:21-22)

plaintiff's employment. *Brooks v. City of San Mateo*, 229 F.3d 917, 929 (9th Cir. 2000) ("Because an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action"). See also *Blount v. Morgan Stanley et al.*, 982 F. Supp.2d 1077, 1083 (N.D.Cal. 2013) (supervisor's failure to invite plaintiff to lunches with other employees was not actionable absent evidence that his "compensation or business acumen would have improved as a result of attending the[] lunches")*; see also Hutchinson v. Seagate Tech.*, 147 Fed.Appx.647 (9th Cir. 2005).

The Ninth Circuit's bar for "severe or pervasive" conduct is high. *See, e.g.. Manatt, supra*, 339 F.3d 792 (finding co-workers' derogatory comments about Chinese people and communism, references to plaintiff as "China woman," imitations and mockery of the appearance of Asian people, and laughter at plaintiff's mispronunciations on account of her Chinese ethnicity was not severe or pervasive); *Kortan v. Calif. Youth Auth.*, 217 F.3d 1104, 1106-07 (9th Cir. 2000) (denying hostile work environment claim where supervisor stated female employee "laughs like a hyena," called female employees "regina," "madonna," "castrating bitches" and called plaintiff "Medea."); *Robles v. Agreserves, Inc.,* 158 F.Supp.3d 952 (E.D.Cal. 2016) (plaintiff's allegations that a Mexican supervisor called him a "stupid Mexican" almost every day and asserted that he was "above all Mexicans" was not sufficiently severe or pervasive); *Sanchez v. City of Santa Ana*, 936 F.2d 1027 (9th Cir. 1990)(employer's racially offensive cartoon post and repeated use of racially offensive slurs, combined with racially disparate treatment of Latino employees, was not severe or pervasive).

To have contributed to a hostile environment, the plaintiff must, at a minimum, have been aware of the incident when it occurred. *Beyda v. City of Los Angeles*, 65 Cal.App.4th 511, 519 (1998)( "a reasonable person would not perceive a work environment to be objectively hostile or abusive based on conduct toward others of which [he] is unaware."); *See also, Landau, supra.*(plaintiffs did not plausibly allege harassment where they asserted exposure to Pro-Palestine protests but had no evidence that each plaintiff was aware of each protest) Likewise, the plaintiff must have personally witnessed the harassing conduct in her workplace. *Pereira v. Schlage Electronics*, 902 F.Supp. 1095 (N.D.Cal. 1995); See also *Felber, supra,* 851

F.Supp.2d at 1188 ("acts occurring…on different campuses entirely, does little to demonstrate that plaintiffs suffered severe and pervasive harassment") Finally, while allegations of harassment against others may be relevant in assessing the "totality of the circumstances," a plaintiff cannot establish a *prima facie* case *solely* based on conduct directed at others in her protected class. *Kortan*, *supra*, 217 F.3d at 1110-11.  Courts give less weight to such because "the impact of 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Gleason v. Mesirow Fin.*,118 F.3d 1134, 1144 (7th Cir. 1997)

Yaniv alleges two incidents directed at her colleagues and three directed towards her over a 14-month period. Regarding the April 2024 MMM incident, Yaniv was unaware of what the term "LMFAO" meant at the time it was used. (Yaniv Depo., 124: 7-8) Regarding the incidents involving McNeil, Yaniv felt "unease" because McNeil appeared not to want to speak with her, but admits that she did not know McNeil's motivation for disturbing her experiment. (Yaniv Depo., 148:12-13, 22-24; 156:21-22) Finally, while Yaniv alleges that she was "excluded" from participating in the Structure Subcommittee, all materials necessary to participate in its research and writing work were available to her on the shared Google Drive.

Yaniv does not allege physical assault, nor does she allege that she heard anyone in the Union use a racial epithet or slur, let alone direct such language towards her. She admits that she did not feel "personally targeted" as an Israeli Jew and does not recall anyone making a comment to her about her nationality. (Yaniv Depo., 58: 8-20; 59:2-5) She remains able to complete her work. (Yaniv Depo., 141:18-23) Thus, even if Yaniv could somehow show that the incidents she has complained of occurred "because of" her or her colleagues' Israeli Jewish identity – which she cannot do - these incidents are categorically less severe or pervasive than those incidents which courts in this Circuit have held were *not* sufficiently severe or pervasive.

### c.  There is No Basis for the Union's Liability

An employer is not vicariously liable for harassment by a plaintiff's coworkers or others. *Andonissamy v. Hewlett-Packard Co.,* 547 F.3d 841, 848 (7th Cir.) The employer may only be liable if the plaintiff can demonstrate *negligence*, *i.e.*, that the employer knew of the harassment and failed to adequately respond to it. *Swinton*, *supra*, 270 F.3d at 803. Likewise, a

union may only be held liable for a hostile work environment when the union or its agents violate the statute. See e.g. *Badlam v. Reynolds Metals Co.*, 46 F.Supp.2d 187, 201-202 (N.D.N.Y. 1999) (the mere fact that an employee who is also a union member engages in unlawful harassment does not result in union liability; rather, the plaintiff must present evidence that the employee was acting within the scope of their authority as a union representative while engaging in the discriminatory behavior.); *Eliserio v. USW, Local 310*, 398 F.3d 1071, 1077 (8th Cir. 2005)("Unions have no duty to take remedial action for discriminatory acts by their individual members.") Because a union is not vicariously liable for all conduct of its rank-and-file members, even if Yaniv could show that the events she complains of were severe or pervasive, she must prove the Union's negligence by showing that the Union knew of the alleged harassment and failed to properly respond to it.

First, Yaniv alleges offensive behavior by rank-and-file members during Union meetings. All record evidence, including Yaniv's sworn testimony, reveals that in both meetings, Chowdhury promptly instructed the crowd to cease its behavior and respect the speaker, and no further disruptions followed. (Yaniv Depo., 127:10-12; 20-24; Shimoni Depo., 44:25; 45:1-5; 45:9-11; Chowdhury Decl., ¶¶ 9,12) These actions were "reasonably calculated to end the harassment." *Ellison v. Brady,* 924 F.2d 872, 878-79 (9th Cir. 1991).

Second, Yaniv alleges that McNeil changed the temperature on her experiment. As McNeil was acting in the scope of her employment, Yaniv must show that the Union knew of McNeil's conduct and failed to adequately respond to it. Here, Yaniv reported the incident to her PI, who then spoke with McNeil herself, after which McNeil apologized. (Yaniv Depo., 150:20-24) There is no evidence that Yaniv informed her PI that she believed McNeil acted this way *because* she was an Israeli Jew. Nor did Yaniv attempt to address this issue with a Union official, though she knew that she could have done so. (Yaniv Depo., 19:10-23)

Third, Yaniv alleges that ███ failure to include her in a group chat for the Structure Subcommittee contributed to her hostile environment. Because ███ is a rank-and-file Union member, Yaniv must prove that the Union knew of her alleged exclusion and failed to take appropriate action.  Yaniv can prove neither. ███ created a Signal chat where some members

of the Structure Subcommittee communicated and discussed their research. No Union officer, agent or staff member was a member of this Signal chat. (Chowdhury Decl., ¶ 8) There is no basis for establishing the Union's liability where the Union was not on notice of this chat.

### E. YANIV FAILS TO STATE A CLAIM FOR DISCRIMINATION (COUNTS ONE AND THREE) [14] BECAUSE SHE HAS NOT ALLEGED OR ESTABLISHED UNION DISCRIMINATION IN ITS AGENCY ROLE

Title VII prohibits workplace discrimination. A *prima facie* case of disparate treatment requires the plaintiff to show she was "singled out and treated less favorably" than similarly situated persons outside her protected class, resulting in an "adverse employment action," which "materially affects the compensation, terms, conditions, or privileges of employment." *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) Such an action "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)

A union's liability under Title VII (and FEHA) stems from its role as the employees' exclusive representative in employment matters. [15] Under Title VII, a union is one that "exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment." 42 U.S.C. § 2000e-(d). Title VII prohibits discrimination by a union "in the performance of its agency function, but not otherwise." *E.E.O.C. v. Pipefitters Assn. Local Union 597*, 334 F.3d 656, 659 (7th Cir. 2003) *See also Woods v. Graphic Communications*, 925 F.2d 1195, 1202-03 (9th Cir. 1991)("[a] union, entrusted with the enforcement of a labor contract, may violate [Title VII] if by racial discrimination it interferes with its members' ability to enforce their contract.") Thus, where a plaintiff has alleged that her union singled her out and treated her "less favorably" than members outside of her protected class, the plaintiff must allege that the union discriminated

---

[14] California courts rely on federal interpretations of Title VII to interpret analogous FEHA provisions. *Bradley v. Harcourt, Brace & Co.*, 104 F.3 267, 270 (9th Cir. 1996) Plaintiff's FEHA claim under Cal. Gov't Code 12940(b) will be analyzed under the Title VII framework.

[15] While unions may also be subject to Title VII liability in their capacity as "employers," Plaintiff asserts no claim that the Union was her employer.  Instead, she has brought Title VII claims against the Union solely in its representational capacity.

against her in its *agency role* such that her working conditions were affected. *See e.g.*, *Garity v. APWU Nat'l Lab. Org.*, 828 F.3d 848, 861 (9th Cir. 2016) ("[T]he key inquiry in a Title VII case against a union is whether the union deliberately declines to pursue a member's claim because of' a protected classification.") Where the union's alleged conduct has no adverse employment effect, the plaintiff's discrimination claim fails. *Reed v. UAW*, 569 F.3d 576 (6th Cir. 2009)(summary judgment for union on plaintiff's Title VII religious discrimination claim where he alleged that its conduct in requiring him to pay union dues to charity was discriminatory, because he had not shown any material adverse employment action).

As in *Reed v. UAW*, Yaniv has not alleged she has experienced an adverse employment action. Nor does she allege that the Union discriminated against her in its representational role vis-à-vis the UC. Rather, she alleges the Union excluded her from "full participation" by withholding communications related to its political position on the Israel/Palestine conflict, and by ignoring her concerns pertaining thereto. Even assuming Yaniv had evidence to support her allegations (she does not), and that she could connect any exclusion to her Israeli Jewish identity (she cannot), the Union's alleged exclusion of her did not affect its *representation* of her with respect to the UC. As she cannot show that the Union discriminated against her in its agency function, she failed to state a disparate treatment claim under Title VII or FEHA.

**F.    ASSUMING, *ARGUENDO*, THAT YANIV CAN STATE A DISCRIMINATION CLAIM AGAINST DEFENDANT, IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW ON COUNTS ONE AND THREE BECAUSE THERE IS NO DISPUTE AS TO ANY MATERIAL FACT AND YANIV CANNOT ESTABLISH A PRIMA FACIE CASE**

A Title VII plaintiff carries the initial burden of establishing a *prima facie* case, by either direct or circumstantial evidence, "that a discriminatory reason more likely than not motivated the defendant's contested conduct." *Metoyer v. Chassman*, 504 F.3d 919, 931 (9th Cir. 2007) A plaintiff's mere suspicion or belief that she was subject to discrimination, unsupported by factual evidence, is insufficient to withstand a motion for summary judgment. *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028 (9th Cir. 2001).

Direct evidence of discrimination is evidence which, if believed, proves discriminatory animus on its face, without inference or presumption. *Aragon v. Republic Silver State Disposal*

*Inc.*, 292 F.3d 654, 662 (9th Cir. 2002) Where the Plaintiff has no direct evidence of discrimination, she may rely on indirect evidence using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See e.g.*, *Beck v. UFCW, Local 99*, 506 F.3d 874, 882 (9th Cir. 2007)(*McDonnell Douglas* applied to Title VII claim against union)

To establish a *prima facie* case of disparate treatment, the plaintiff must show that 1) she is a member of a protected class, she was 2) "singled out and treated less favorably than others similarly situated," and 3) the union treated her this way because of her membership in a protected class. *Garity*, *supra*, 828 F.3d at 859. The "ultimate focus of the inquiry, and thus proof, is whether or not the decision or action in question was racially premised." *Golden v. Int'l Ass'n of Firefighters*, 633 F.2d 817, 821 (9th Cir.). Under the *McDonnell Douglas* framework, if the union can articulate a nondiscriminatory reason for its treatment, the plaintiff may show that the union's stated reason is pretextual. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 526 (1993)("The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff").

As with a hostile environment claim, exclusion from work-related social events or meetings is not actionable as disparate treatment, absent evidence that the exclusion materially impacted terms and conditions of the plaintiff's employment. *Brooks*, *supra*, 229 F.3d at 929; *Hutchinson*, *supra*, 147 Fed.Appx. 647; *Blount, supra*, 982 F.Supp.2d at 1083.

### a. Yaniv Has Not Identified Similarly Situated Members Treated More Favorably

Although the *prima facie* stage of the *McDonnell Douglas* framework is not onerous, a claimant bringing a disparate treatment claim must still show that a similarly situated union member, outside her protected class, was treated more favorably than she was "under nearly identical circumstances." *Vasquez v. Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003); *see*, *Asing v. Hawaii Govt. Emps. Assn.,* Case No. 23-00335 HG-KJM, *13, 2024 U.S. Dist. LEXIS 68424 (D.Haw. Apr. 15, 2024) Where plaintiff fails to produce such evidence, summary judgment must be granted to defendant. *Jones v. Bayer Healthcare*, 302 Fed. Appx. 590 (9th Cir. 2008)

Yaniv's disparate treatment claim rests on conclusory allegations that she was excluded from "full participation in the Union" because of her Israeli Jewish identity, and that "only

other Israeli Jews" were treated similarly to her. (Complaint, ¶¶ 2, 3, 6, 19, 21, 42, 109, 131, 140, 150) She alleges that she failed to receive Israel/Palestine-related communications and meeting agendas and that the Union ignored her concerns about its political positions.

As described, these allegations fail to state a claim because she has not alleged that the Union's representation of her vis-à-vis the UC, was impacted. Moreover, she has produced no evidence that any similarly situated individual *outside her protected class* received said communications or meeting agendas, or expressed similar concerns to the Union but were *not* ignored.[16] On this basis alone, the court must grant summary judgment for the Union. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006)

### b. Assuming Yaniv's Allegations Could Support a Disparate Treatment Claim Against the Union, She Has No Evidence to Support Them

The undisputed facts illustrate that Yaniv was not excluded from "full participation in the Union." Even before joining, Yaniv had over seven in-person conversations with Union officials over a period of three months, where she expressed her concerns with the Union's October 13th Statement and its "alignment" with Pro-Palestine campus rallies.

After joining the Union, Yaniv continued to engage in dialogue with Union officials. She was invited to attend, and did attend, Union membership meetings. She spoke at these meetings and felt that she had the opportunity to fully express her views. (Yaniv Depo., 86:10-11) Yaniv admits to receiving Union communications, despite alleging the contrary in her Complaint. She has produced no evidence of a Union communication that she did not receive. (Yaniv Depo. 132:1) She alleges that the Union "withheld meeting agendas" from her, but produced no evidence that the Union sent agendas to *anybody* prior to membership meetings.[17] Yaniv also alleges that at the January 2024 MMM, she was precluded from adding an item to

---

[16] Plaintiff has produced *no evidence*, for example, that non-Jewish Israeli members were treated more favorably, that Jewish non-Israeli members were treated more favorably, or that non-Jewish, non-Israeli members were treated more favorably by the Union than she was, with respect to *any* of her disparate treatment allegations.

[17] When asked why she believed that the Union withheld the agenda from her for the January 2024 membership meeting, Yaniv testified that, "I[t] felt like everyone knew what is going to happen besides Neta and I." (Yaniv Depo., 120:15-19) Yaniv admitted that she did not know of any individual who *had* received an agenda prior to the January 31, 2024 membership meeting. (Yaniv Depo., 120:15-17; 162:15-17)

the agenda because, "the opportunity to propose such motions had passed." Again, she has produced no evidence that this response was discriminatory.

Finally, Yaniv alleges that she was excluded from the work of the Structure Subcommittee of the BDS Exploratory Committee, but the undisputed facts show otherwise. The Subcommittee worked "asynchronously," meaning its members conducted open-source research and writing on their own time and added their findings to a Google Drive. Yaniv was given full access to the Drive shortly after requesting it, which included a spreadsheet listing available research tasks. (████ Depo., 64:13-25; 65:1-2) Yaniv had no reason to believe that her access to these materials had been revoked. (Yaniv Depo., 99:16) She did not try to add anything to the Drive, nor discover what other members of the Subcommittee were doing. She did not attempt to write or edit the final report. (Yaniv Depo., 99:24) Yaniv *chose* not to contribute to the Subcommittee's work, which should not be confused with "exclusion."

### G. COUNT FOUR FAILS TO STATE A CLAIM AGAINST THE UNION FOR FAILURE TO PREVENT DISCRIMINATION UNDER CAL. GOV'T CODE § 12940(k) AS THERE WAS NO UNDERLYING DISCRIMINATION OR HARASSMENT AGAINST PLAINTIFF

A plaintiff cannot sustain a claim for failure to take all reasonable steps to prevent discrimination absent a finding of actual discrimination or harassment. *Trujillo v. N. Cnty. Transit Dist.*, 63 Cal.App.4th 280, 289 (1998). Summary judgment must be granted on a claim under Cal. Gov't Code § 12940(k) where a plaintiff cannot demonstrate she was subjected to discrimination or harassment. *DFEH v. Lucent Techs. Inc*, 642 F.3d 728, 748 (9th Cir. 2011). Here, Yaniv cannot state claims for discrimination or hostile work environment, so the Union cannot be liable under Cal. Gov't Code § 12940(k) for failing to prevent discrimination or harassment. *Featherstone v. S. Calif. Permanente Med. Grp,* 10 Cal.App.5th 1150, 1166 *Group* (2017) ("[T]here's no logic that says an employee who has not been discriminated against can sue an employer [or a union] for not preventing discrimination that didn't happen.")

## V. CONCLUSION

For all the foregoing reasons, Defendant Union respectfully submits that its Motion for Summary Judgment on all claims and for entry judgment in its favor should be granted.

DATE: July 27, 2026                    Respectfully submitted,

SCHWARTZ, STEINSAPIR, DOHRMANN
  & SOMMERS LLP
MICHAEL R. FEINBERG
MARGO A. FEINBERG
LEORA SWERDLOW


By/s/Michael R. Feinberg
          MICHAEL R. FEINBERG
          Attorneys for Defendant,
      Local 4811 International Union, United
      Automobile, Aerospace, and Agricultural
          Implement Workers of America

Memorandum of Points and Authorities in Support of Defendant's MSJ; Case No. 4:25-cv-00819-AMO