Thomas Myers (SBN 120674)
Email: myers@smithmyerslaw.com
SMITH & MYERS LLP
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: 213.613.2380
Facsimile: 213.613.2395

Danielle R. Acker Susanj (pro hac vice)
PA Attorney I.D. No. 316208
Email: drasusanj@fairnesscenter.org
Jonathan R. Vaitl (pro hac vice)
PA Attorney I.D. No. 324164
Email: jrvaitl@fairnesscenter.org
Nathan J. McGrath (pro hac vice)
PA Attorney I.D. No. 308845
Email: njmcgrath@fairnesscenter.org
Anthony R. Holtzman (pro hac vice)
PA Attorney I.D. No. 200053
Email: arholtzman@fairnesscenter.org
THE FAIRNESS CENTER
500 North Third Street, Suite 600
Harrisburg, Pennsylvania 17101
Telephone: 844.293.1001
Facsimile: 717.307.3424

Attorneys for Plaintiff Karin Yaniv

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION**

| | |
|---|---|
| KARIN YANIV,<br><br>Plaintiff,<br><br>v.<br><br>LOCAL 4811, INTERNATIONAL UNION, UNITED AUTOMOBILE, AEROSPACE, AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA,<br><br>Defendant. | **Case No. 25-cv-00819-AMO (AGTx)**<br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>**Date:** **November 19, 2026**<br>**Time:** **2:00 p.m.**<br>**Ctrm:** **1301 Clay Street, Oakland, California, Courtroom 5**<br><br>**Trial Date: April 19, 2027**<br><br>**Action filed: January 24, 2025** |

## TABLE OF CONTENTS


INTRODUCTION ..... 5

STATEMENT OF ISSUES TO BE DECIDED ..... 6

STANDARD OF REVIEW ..... 6

FACTUAL BACKGROUND ..... 7

ARGUMENT ..... 15

I. THE EVIDENCE IS SUFFICIENT TO PRECLUDE SUMMARY JUDGMENT ON COUNTS ONE AND THREE ..... 15

A. Based on the Evidence in the Record, Dr. Yaniv Can Make Out a Prima Facie Claim that the Union Discriminated Against Her Because She Is Israeli ..... 16

i. The record contains sufficient evidence that the Union singled out Dr. Yaniv and treated her less favorably than other people who were situated similarly to her ..... 16

ii. The record contains sufficient evidence that the Union treated Dr. Yaniv differently, and worse, than similarly-situated people because she is Israeli ..... 20

iii. The Union's discrimination served to diminish its performance as an exclusive representative ..... 23

B. The Union's Proffered Justification for the Disparate Treatment Is Pretextual ..... 24

II. THE EVIDENCE IS SUFFICIENT TO PRECLUDE SUMMARY JUDGMENT ON COUNT TWO ..... 24

A. Under Title VII, Unions Can Be Liable for Creating Hostile Environments ..... 25

B. The Record Contains Sufficient Evidence of Discriminatory Intimidation, Ridicule, or Insult ..... 26

C. The Record Contains Sufficient Evidence That the Anti-Israeli Discriminatory Behavior Was Severe and Pervasive ..... 27

D. The Record Contains Sufficient Evidence that the Union's Hostility Affected the Terms and Conditions of Dr. Yaniv's Employment ..... 28

III. THE UNION HAS NOT SHOWN THAT IT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT FOUR ..... 29

# TABLE OF AUTHORITIES

## Cases

*Angelino v. New York Times Co.*, 200 F.3d 73 (3d Cir. 1999) ....................26

*Asing v. Hawaii Gov't Emps. Ass'n – AFSCME Loc. 152*, No. 24-3101, 2025 WL 1588732 (9th Cir. June 5, 2025) ....................15

*Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136 (9th Cir. 2001) ....................15

*Bohnert v. Roman Catholic Archbishop of San Francisco*, 136 F. Supp. 3d 1094 (N.D. Cal. 2015) ....................29

*Brooks v. City of San Mateo*, 229 F.3d 917 (9th Cir. 2000) ....................27

*Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018 (9th Cir. 2006) ....................16

*Daggitt v. UFCW Int'l Union Loc. 304A*, 59 F. Supp. 2d 980 (D.S.D. 1999) ....................23

*Demetris v. Transp. Workers Union*, 862 F.3d 799 (9th Cir. 2017) ....................23

*Dixon v. Int'l Broth. of Police Officers*, 504 F.3d 73 (1st Cir. 2007) ....................23

*Dowd v. United Steelworkers, Loc. No. 286*, 253 F.3d 1093 (8th Cir. 2001) .................... 25, 26, 28, 29

*EEOC v. Village At Hamilton Pointe LLC*, 103 F.4th 387 (7th Cir. 2024) ....................27

*Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245 (S.D.N.Y. 2025) ....................25

*Gessele v. Jack in the Box Inc.*, 174 F.4th 1108 (9th Cir. 2026) .................... 6, 22

*Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151 (9th Cir. 2010) .................... 15, 21

*McEntee v. Santa Clara Cnty. Office of Educ.*, 25-cv-08008, 2026 WL 2109533 (N.D. Cal. 2026) ....................15

*McGinest v. GTE Serv. Corp.*, 360 F.3d 103 (9th Cir. 2004) ....................24, 25, 27

*National R.R. Passenger Corp. v. Morgan*,
536 U.S. 101 (2002) ....................25, 26, 28

*Nghiem v. Santa Clara Univ.*,
710 F. Supp. 3d 748 (N.D. Cal. 2024) ....................6

*Phillips v. UAW Int'l*,
854 F.3d 323 (6th Cir. 2017) ....................26

*Pringle v. Wheeler*,
478 F. Supp. 3d 899 (N.D. Cal. 2020) ....................27

*Raad v. Fairbanks North Star Borough Sch. Dist.*,
323 F.3d 1185 (9th Cir. 2003) ....................21

*U.S. EEOC. v. Abercrombie & Fitch Stores, Inc.*,
966 F. Supp. 2d 949 (N.D. Cal. 2013) ....................6

*Wallis v. J.R. Simplot Co.*,
26 F.3d 885 (9th Cir. 1994) ....................15

*Zetwick v. Cnty. of Yolo*,
850 F.3d 436 (9th Cir. 2017) ....................6

**Statutes**

42 U.S.C. § 2000e-2 ....................15

Cal. Gov't Code 12940 ....................29

**Other**

Fed. R. Civ. P. 56 ....................6

## INTRODUCTION

In its Motion for Summary Judgment ("Motion"), Defendant Local 4811 ("Union") attacks the claims that it wishes Dr. Yaniv had asserted, not her actual claims. While attempting to sanitize the actions that its officials and those acting on its behalf took to minimize and exclude Israelis, *as Israelis*, the Union now characterizes those actions as nothing more than "political debate" by "rank-and-file" members. But, as Dr. Yaniv has consistently maintained, this case is not about political debate.[1] To the contrary, the undisputed facts show that the Union's officials announced their intent to prevent Israeli participation in its activities that pertained to the Israeli-Palestinian conflict as part of their commitment to "anti-normalization." The Union then set about to deliberately minimize the participation of Israelis in those activities, beginning with its response to the Hamas-led attack on Israel on October 7, 2023. The Union also made no meaningful effort to stop the persistent hostility that was directed at Israelis during its meetings. Union officials took no action to address Dr. Yaniv's concerns about discrimination, and instead repeatedly instituted new rules that created barriers to her ability to participate and communicate at Union activities and in Union spaces. The hostility and exclusion were severe and pervasive enough that Israeli members left the Union. Because Dr. Yaniv joined the Union, to its officials' dismay, and then did not give up or resign her membership despite its attempts to sideline her, she was ultimately denied the access that she needed to be a full participant in the work of one of its campus committees.

The Union now attempts to sanitize its conduct and rewrite history, claiming that Dr. Yaniv is simply complaining about political debates among its rank-and-file members. But the actions at issue go far beyond political disagreement and involved a number of the Union's officials, including

---

[1] This Court has been down this road before. In its Motion to Reopen Discovery, the Union expressed its fundamental misunderstanding of the case. It suggested that Dr. Yaniv's claims center on political discourse. Dkt. 66. They do not. In response to the Motion to Reopen Discovery, Dr. Yaniv explained that her claims, in fact, are based on discrimination and exclusion that she experienced at the hands of Union officials and within Union spaces. And her allegations regarding the political environment simply illustrate the facts that are necessary to understand the context in which she began participating in the Union and experienced discrimination and exclusion. Dkt. 68. In the instant Motion, the Union continues to rely on its misguided notion about Dr. Yaniv's theory of the case. Simply put, the case that the Union is arguing is not the case that is before this Court. What Dr. Yaniv explained previously is equally true today: this case arises from the Union's discriminatory conduct, not its political speech.

its own corporate designee in this matter. The evidence that has been elicited thus far, as documented below, establishes, and certainly raises a genuine question of material fact as to whether, the Union intentionally discriminated against, or permitted hostility toward, Israelis based on their national origin. Accordingly, as discussed in more detail below, the Court should deny the Motion.

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether there is a genuine question of material fact regarding the Union's discrimination against Dr. Yaniv based on her Israeli national origin, in violation of Title VII of the Civil Rights Act of 1964 (Count One) and the California Fair Employment and Housing Act (Count Three).

2. Whether there is a genuine question of material fact regarding the Union's creation of a hostile environment that adversely impacted Dr. Yaniv based on her Israeli national origin, in violation of Title VII of the Civil Rights Act of 1964 (Count Two) and the California Fair Employment and Housing Act (Count Four).

**STANDARD OF REVIEW**

Summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A disputed issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nghiem v. Santa Clara Univ.*, 710 F. Supp. 3d 748, 752 (N.D. Cal. 2024) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a motion for summary judgment, "a court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in its favor." *U.S. EEOC. v. Abercrombie & Fitch Stores, Inc.*, 966 F. Supp. 2d 949, 958 (N.D. Cal. 2013). Further, at the summary judgment stage, the Court does not make credibility determinations, weigh the evidence, or determine the truth of the matter but, instead, only evaluates whether there is a genuine issue for trial. *Gessele v. Jack in the Box Inc.*, 174 F.4th 1108, 1122 (9th Cir. 2026) ("[C]ourts cannot decide which witnesses are credible at summary judgment."); *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) ("a judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter but to

determine whether there is a genuine issue for trial").[2]

## FACTUAL BACKGROUND

Plaintiff, Dr. Karin Yaniv, is an Israeli citizen who is a postdoctoral employee of the University of California, Berkeley ("Berkeley"). Deposition of Karin Yaniv ("Yaniv Depo."), attached to the Declaration of Jonathan R. Vaitl ("Vaitl Decl.") as Exhibit A, at 15:17-16:19. In that role, Dr. Yaniv was a member of the bargaining unit for Local 5810, United Automobile, Aerospace, and Agricultural Implement Workers of America ("UAW"). Declaration of Rafael Jaime ("Jaime Decl.") [Dkt. 70-11], ¶ 2. UAW Local 5810 subsequently merged with another local union at the University of California, UAW Local 2865, to form the Defendant Union in this matter, UAW Local 4811. Deposition of David Weitz ("Weitz Depo."), attached to Vaitl Decl. as Exhibit B, at 17:4-6.

### *Campus Environment Post-October 7 Attack*

To provide context for Dr. Yaniv's claims, in the aftermath of the Hamas-led attack on Israel that took place on October 7, 2023 ("October 7 Attack"), protests began to take place throughout the University of California, including on the Berkeley campus, which included anti-Israel chants and attacks on Israeli and Jewish students. Yaniv Depo. 28:8-24. Union officials participated in those protests and even promoted them through official Union communications. Deposition of Rafael Jaime ("Jaime Depo.") attached to Vaitl Decl. as Exhibit G, at 62:3-14, 73:2-75:15. The Union also maintained a presence at a pro-Palestine encampment on the Berkeley campus, through the formation of what became known as the "Union Village." Vaitl Decl., Ex. J (text message from Iris Rosenblum-Sellers, a Union official, stating that the Union "did the union village"); Deposition of Tanzil Chowdhury ("Chowdhury Depo.") attached to Vaitl Decl. as Exhibit H, at 43:8-45:1. The Union's recent efforts to distance itself from the "Union Village," *see, e.g.,* Chowdhury Depo. 44:19-45:1, are inconsistent with what the record shows and amount to one of several illustrations of its attempts to recast its actions as simply those of "rank-and-file" members. Dr. Yaniv feared that she, as an Israeli, might be targeted in the environment at Berkeley, particularly after she made her identity known during Union meetings. Yaniv Depo. 57:17-58:1.

[2] The Union styles many of its arguments as supporting a motion to dismiss. In doing so, the Union cites only the allegations in the Complaint, while ignoring what the evidence shows. Here, the question is not whether Dr. Yaniv has stated a claim, but whether there is a genuine issue for trial.

***The Union's Exclusion of Israelis to Avoid "Normalization" of Their Views***

On October 13, 2023, in response to the October 7 Attack, the executive board of UAW Local 2865 issued a statement ("October Statement") that, from the perspective of Dr. Yaniv and others, used inflammatory language to blame Israel for the attack. Yaniv Depo. 23:9-24:23, Ex. 2; Deposition of Neta Shimoni ("Shimoni Depo."), attached to Vaitl Decl. as Exhibit C, 14:7-14, 17:3-11. After seeing the October Statement, and experiencing the climate on campus, Dr. Yaniv and other Israelis who worked and studied on campus, including Neta Shimoni and Yael Nidam,[3] reached out to the Union on several occasions to express concerns about the climate and the Union's participation in it. They expressed concerns, in particular, about the October Statement's one-sided messaging. Yaniv Depo. 24:13-23; Shimoni Depo. 22:23-23:14. They also asked the Union not to boycott Israeli academics because, if it did so, the boycott would have directly and adversely impacted them. Deposition of Yael Nidam ("Nidam Depo."), attached to Vaitl Decl. as Exhibit D, 12:12-16. They were hopeful, at least at first, that the Union would support them and take steps to make the campus feel safe for everyone, including Israelis. Yaniv Depo. 26:8-13.

Although initially encouraged by the Union's response, Dr. Yaniv and others quickly learned that its willingness to listen rang hollow, and it would not take any action to address their concerns. Shimoni Depo. 40:18-41:10. *See also* Jaime Depo. 55:12-56:5. On December 13, 2023, therefore, Dr. Yaniv, Dr. Shimoni, and others, who had organized as a group known as "UC Against Hate," presented several of the Union's leaders with a formal request to revise the October Statement and prioritize the well-being of ***all*** of the individuals who it represents, regardless of their religion or national origin. Yaniv Depo. 66:7-20; Weitz Depo., Ex. 4. On December 15, Dr. Yaniv and Dr. Shimoni met with two Union leaders, Laura Cook and David Weitz. Weitz Depo. 53:10-22; Shimoni Depo. 16:4-18:8, Ex. 1. Ms. Cook was the Recording Secretary for UAW Local 5810. Jaime Decl. [Dkt. 70-11], ¶ 10. David Weitz was employed as a lead organizer for UAW Local 5810 and later continued in that role for UAW Local 4811. Weitz Depo. 16:15-17:10. During the meeting, Dr. Shimoni asked why the Union excluded Israelis from conversations relating to its public statements

[3] Dr. Shimoni and Ms. Nidam both provided deposition testimony about their Israeli national origin. *See* Shimoni Depo. 8:25-9:23; Nidam Depo. 23:12-14.

about Israel and possible efforts to pursue boycott, divestment, and sanctions ("BDS") efforts. It is uncontested that both Ms. Cook and Mr. Weitz stated that Union leaders wanted to exclude Israelis to avoid "normalizing" their participation in its actions relating to the October 7 Attack. Shimoni Depo. 20:11-21:24, Ex. 1. After the meeting, Dr. Shimoni learned that "anti-normalization" is a central tenet of the BDS movement and is focused on boycotting activities or discussions in which Israelis are permitted to speak on equal footing with Palestinians. Shimoni Depo. 21:1-9.[4]

After the December 15, 2023, meeting, knowing that Dr. Yaniv was not among its dues-paying members at that time, Union leaders, including Sarah Arveson, sought to impose a new rule that limited any of its future meetings to only dues-paying members. Yaniv Depo. 68:11-70:25; Yaniv Decl., Ex. A; Vaitl Decl., Ex. E. Sarah Arveson was the vice president of UAW Local 5810. Jaime Decl. [Dkt. 70-11], ¶ 10. Not wanting to be further silenced, Dr. Yaniv joined the Union in late December 2023 or early January 2024. Yaniv Depo. 71:25-72:2. Upon learning that Dr. Yaniv had joined the Union, Ms. Arveson responded with, "oh shit." Vaitl Decl., Ex. F.

On January 19, 2024, Dr. Yaniv, Dr. Shimoni, Ms. Nidam, and other Israelis met with Union leaders to discuss their experiences as Israelis. Shimoni Depo. 26:15-28:19; Jaime Depo., Ex. 3, at 1. Given the nature of the meeting, Union leaders knew of Dr. Yaniv's Israeli nationality. Jaime Depo. 50:7-12. During the meeting, Ms. Nidam shared her personal story of family members who had been taken hostage by Hamas in the October 7 Attack and urged the Union to consider following a joint Palestinian-Israeli movement called Standing Together, which involves advocating for peace. Jaime Depo., Ex. 3, at 1. Dr. Shimoni talked about the impact of the Union's actions on its Israeli members, noting that she was uncomfortable asking it for help with employment disputes because she believed that it would have an agenda against her based on her Israeli national origin. Jaime Depo., Ex. 3, at 1; Shimoni Depo. 39:5-24. Union officials refused to act on any of their concerns.

---

[4] This conception of "normalization" is consistent with how the BDS National Committee itself defines that term. *See* BDS Nat'l Comm., *The BDS Movement's Anti-Normalization Guidelines Explained,* BDS Movement (Oct. 29, 2022), https://usacbi.org/guidelines-for-applying-the-international-academic-boycott-of-israel/ (stating that discussions or activities that include both Israeli and Palestinian perspectives are to be boycotted because they are "based on the false premise of symmetry/parity between the oppressors and the oppressed" and that Israelis are only to be permitted to participate if they "recognize[] the comprehensive Palestinian rights under international law" and the dialogue centers on "co-resistance rather than co-existence").

In fact, they failed to even acknowledge that the Union's actions were contributing to Israelis feeling unsafe on campus. Shimoni Depo. 34:19-35:2; Jaime Depo. 55:12-56:5. One Union representative outright denied that the October Statement had the effect that the Israeli members described. Shimoni Depo. 33:21-34:6.

After the January 19 meeting, Dr. Shimoni provided the Union with a proposal to make Israelis feel protected and welcome, and she intended to present the proposal at the January 2024 membership meeting. Shimoni Depo. 82:3-84:6. Mr. Chowdhury told Dr. Shimoni how to make a proposal to the Union, and she followed his instructions. *Id.* But then the Union, again, imposed new requirements. Shimoni Depo. 82:11-16. Specifically, some of its leaders told Dr. Shimoni that she could not provide it with a proposal without first getting support from other members and engaging in a back-and-forth with its leadership. Shimoni Depo. 82:17-83:1.

***Union BDS Committee and Efforts to Intimidate and Exclude Israelis***

On January 31, 2024, UAW 2865 and UAW 5810 held a joint membership meeting, which included, as one of its agenda items, the presentation of a resolution titled "Committing to a Labor Strategy towards Boycott, Divestment and sanctions at the University of California" ("January BDS Resolution"). Yaniv Depo., Exs. 3 & 4. The January BDS Resolution urged the Union's international executive board "to ensure that the working group on 'Divestment and Just Transition' has the needed resources to execute its mission, and that it establish channels to receive input from Palestinian, Arab and Muslim workers," without a similar call for input from Israeli or Jewish workers. Yaniv Depo., Ex. 4. The resolution further "commits to protecting all workers at the University of California facing harassment or retaliation for their Palestinian identity or advocacy," without any such commitment to protect workers from harassment or retaliation based on their Israeli or Jewish identities. *Id.* The Union omitted those commitments to Israelis even after Dr. Yaniv and other Israelis expressed their concerns about exclusion and discrimination in their meetings with its leaders. Shimoni Depo. 20:11-21:24, 26:15-28:19, Ex. 1; Jaime Depo., Ex. 3, at 1.

The resolution also stated that "UAW 2865 and 5810 Berkeley shall establish a BDS exploratory committee" to "identify potential targets for a BDS campaign at the University of California [.]" *Id.* Union members voted to pass the resolution and create the BDS Exploratory

Committee ("BDS EC") on the Berkeley campus. Jaime Depo. 48:17-49:5; Yaniv Depo., Ex. 4. The BDS EC is a campus-level committee, which the Union's bylaws authorize campus units to form, as needed. Jaime Decl. [Dkt. 70-11], Ex. D, Art. 11, Sec. 5. Union officials, in fact, recognized that the BDS EC was a Union committee. Tanzil Chowdhury referred to the BDS EC as a "union space" and, later, a "union [working group]." Chowdhury Depo., Ex. 6 at 6, 11. Mr. Chowdhury is the statewide Academic Student Employee ("ASE") Unit Chair for UAW Local 4811. Chowdhury Decl. [Dkt. 71-4], ¶ 2, 3. Mr. Weitz also referred to it as a union space. Weitz Depo. 83:1-15, 83:22-84:17.

Dr. Yaniv and Dr. Shimoni joined the BDS EC. Yaniv Depo. 88:12-17; Shimoni Depo. 79:6-9. The BDS EC convened its first meeting on February 12, 2024. Deposition of [redacted] ("[redacted] Depo."), attached to Vaitl Decl. as Exhibit I, at 37:17-19. Both Dr. Yaniv and Dr. Shimoni attended the meeting. Yaniv Depo. 88:12-17; Shimoni Depo. 79:6-24. Iris Rosenblum-Sellers also attended the meeting. [redacted] Depo. 39:10-21. Rosenblum-Sellers was the head steward for UAW Local 2865 and is currently the ASE Unit Chair at Berkeley. Jaime Depo. 49:6-12. During the meeting, members of the BDS EC were hostile toward Dr. Yaniv and Dr. Shimoni, accused them of attending the meeting in bad faith, and tried to exclude them from the committee. Shimoni Depo. 86:8-22. After Dr. Shimoni confronted the committee about the fact that it was trying to exclude only its two Israeli members from participating in the meeting, the tone shifted toward excluding individuals who would "disrupt" the work of the committee. Shimoni Depo. 86:8-18. There is no evidence that Dr. Yaniv or Dr. Shimoni made any effort to disrupt the work of the committee. Moreover, the BDS EC did not vet any other committee member's motives or try to exclude anyone else from participating in its affairs. [redacted] Depo. 53:4-7.

***Exclusion from BDS EC Subcommittees***

During its first meeting, the BDS EC formed three subcommittees: academic and public-private partnerships, investments, and structure mapping. Yaniv Depo. 91:8-92:16; [redacted] Depo. 53:8-22, Ex. 8. The three subcommittees collectively performed all of the work of the BDS EC. [redacted] Depo. 105:4-9. Each subcommittee had a "bottom-liner" who oversaw its work. Mr. [redacted] served in that role for the structure mapping subcommittee ("Structure Subcommittee"). [redacted] Depo. 56:12-19. In that role, Mr. [redacted] would "delegate tasks in an efficient way to make sure

work is being kept track of." [redacted] Depo. 57:20-58:2. On February 14, 2024, Dr. Yaniv e-mailed Mr. [redacted] to join the Structure Subcommittee. Yaniv Depo. 97:25-98:4; [redacted] Depo., Ex. 8.

Mr. [redacted] established a group chat for the Structure Subcommittee. [redacted] Depo. 59:10-23, Ex. 8. The group chat was the only tool that Mr. [redacted] used to schedule meetings for, and coordinate the work of, the Structure Subcommittee. [redacted] Depo. 59:6-9, 61:22-25, 62:23-63:1, 65:3-7. Mr. [redacted] knew that he had not added Dr. Yaniv to the group chat but continued to use it (and only it) for subcommittee work, without communicating that information to her by another means. [redacted] Depo. 61:3-62:10, 67:22-69:7. On February 21, 2024, Dr. Yaniv contacted Mr. [redacted] to ask when the subcommittee would begin its work. [redacted] Depo., Ex. 8. On February 24, 2024, Mr. [redacted] responded to Dr. Yaniv by providing her with a link to a Google Drive folder that contained the already-started work of the subcommittee but deliberately failed to mention that the subcommittee was communicating and coordinating work through a group chat from which she had been excluded. [redacted] Depo. 74:14-75:23, Ex. 8. Dr. Shimoni, similarly, sought to join the investments subcommittee, but received no response to her request and, consequently, was not included in that subcommittee. Shimoni Depo. 80:5-81:17.

Dr. Yaniv spoke with Mr. Weitz about the fact that she and Dr. Shimoni had been excluded from the subcommittees. Yaniv Depo. 100:19-101:10. Mr. Weitz told her that the Union could not legally exclude her from the BDS EC but that the subcommittees were like a caucus, and therefore members could choose not to include her in those bodies. *Id.*

### *Anti-Israeli Hostility at Union Meetings*

On January 31, 2024, Dr. Yaniv and Dr. Shimoni attended their first Union membership meeting and noticed that other members, including people whom they had never met, already knew their names and status as postdoctoral employees. Yaniv Depo. 62:5-9; Yaniv Decl. ¶ 5; Shimoni Depo. 59:11-60:5. The meeting was hostile and intimidating to Dr. Yaniv and Dr. Shimoni, to the degree that Dr. Shimoni did not feel comfortable trying to gather support for her proposal from other members. Shimoni Depo. 84:1-6. Ms. Arveson and Mr. Weitz privately acknowledged that the meeting was hostile and suggested that the hostile atmosphere was desirable. *See* Vaitl Decl., Ex. K. (text from Ms. Arveson stating, "Neta and Karin gonna leave the union before we even start talking

about Palestine with this crowd," to which Mr. Weitz replied, "I can't work miracles."). *See also* Weitz Depo. 87:6-24, Ex. 11. After their experience at this meeting, Dr. Yaniv and Dr. Shimoni did not attend subsequent Union meetings in person. Yaniv Decl. ¶ 6; Shimoni Depo. 101:13-103:3.

On March 6, 2024, Dr. Yaniv and Dr. Shimoni attended the Union's membership meeting. Yaniv Decl. ¶ 7. During the meeting, Dr. Shimoni spoke about her experience as an Israeli and how the Union's actions made her feel alienated and discriminated against because she is an Israeli. Yaniv Decl. ¶ 7. Dr. Yaniv witnessed Union members react to her statement with hostility and "boos." Shimoni Depo. 43:11-44:18, Ex. 5; Yaniv Decl. ¶ 7. As these events occurred, Union leaders were present and yet did nothing more than ask members to keep order. Shimoni Depo. 44:19-45:11; Yaniv Decl. ¶ 7. Similar hostility erupted during the April 2, 2024 monthly membership meeting. During that meeting, the BDS EC presented a second BDS resolution ("April BDS Resolution"). [redacted] Depo. 85:14-86:25, Ex. 11. The April BDS Resolution called for specific boycotts and stated that "we in the UAW 4811 campus units at Berkeley/LBNL declare our commitment to bargain and strike for these demands in our 2025 contract campaign[.]" [redacted] Depo., Ex. 11. Dr. Yaniv, Dr. Shimoni, and Ms. Nidam participated in the meeting remotely. Yaniv Depo. 122:2-13; Yaniv Decl. ¶ 8; Shimoni Depo. 66:17-21; Nidam Depo. 38:15-25.

During the April 2024 meeting, members who also were attending virtually did not turn their cameras on or show their faces while speaking in support of Palestinians or criticizing Israel and Israelis. Yaniv Decl. ¶ 8. Their comments were met with widespread support and applause from others in attendance. *Id.* No union official said anything about their cameras being off while they spoke. *Id.*. After those individuals spoke, Ms. Nidam also spoke without showing her face on the screen. Yaniv Decl. ¶ 9. She introduced herself as an Israeli and a peace activist and spoke about her family members who had been killed by Hamas. Nidam Depo. 23:11-19. While Ms. Nidam spoke, Mr. Chowdhury interrupted her to announce a new rule that any speaker who was attending virtually needed to show their face on the screen before the Union would permit them to speak. Yaniv Decl. ¶ 9. Ms. Nidam was required to show her face to continue speaking. *Id.* Ms. Nidam received immediate backlash from others in attendance. *Id.*. Union members mocked and laughed at her. Nidam Depo. 18:11-15, 19:15-24; Yaniv Depo. 122:2-123:5; Yaniv Decl. ¶ 9. The interruptions were

so disruptive that Ms. Nidam could not finish her remarks. Nidam Depo. 22:11-16. While Ms. Nidam was speaking, one member, who was participating in the meeting remotely, wrote "LMFAOO" in the meeting's Zoom chat. Shimoni Depo. 68:2-6; Yaniv Depo. 122:2-123:5. Once Ms. Nidam stopped speaking, another member stated that, as an Israeli, Ms. Nidam had no right to an opinion on the Israeli-Palestinian conflict and proposed BDS efforts. Nidam Depo. 18:11-15, 19:15-24; Yaniv Decl. ¶ 9. Members made these types of comments throughout the meeting, every time that Ms. Nidam tried to speak. Nidam Depo. 22:2-16. None of the Union leaders present told the people who were making those comments to stop doing so. Nidam Depo. 39:25-40:6; Yaniv Decl. ¶ 9. Afterward, no one else who identified as Israeli spoke during the meeting. Yaniv Decl. ¶ 10. Although Dr. Yaniv had spoken earlier in the meeting without showing her face, she did not speak again once the new rule was announced. Yaniv Decl. ¶ 10. Further, because Dr. Yaniv did not feel safe and feared that, in Union meetings, she would face verbal attacks on account of her Israeli national origin, she stopped attending the meetings in person and even stopped attending many of them virtually. Yaniv Decl. ¶ 11. She did not feel comfortable showing her face during Union meetings and did not see a reason to attend the meetings if she could not speak there. *Id.* Therefore, as a result of the Union's new rule, she did not speak during future Union meetings. *Id.*

In light of these events, Ms. Nidam believed that, as an Israeli, she did not have a right to participate in the Union, and immediately revoked her membership. Nidam Depo. 24:14-23. Dr. Shimoni also resigned her Union membership after the April 2024 meeting. Shimoni Depo. 70:14-71:2, Ex. 6. To the best of Dr. Yaniv's knowledge, several other Israeli members likewise revoked their Union memberships. Yaniv Depo. 130:24-131:8. Dr. Yaniv herself strongly considered leaving the Union, because she felt unwelcome in it, but she decided to maintain her membership to stay as informed as she could about its actions. Yaniv Depo. 131:12-22. Dr. Yaniv e-mailed Union leaders about the hostility that occurred during the March and April membership meetings. Yaniv Decl., Ex. B. In response, Mr. Chowdhury failed to even acknowledge that the hostility occurred or that it was directed at Israeli members who were speaking about their experiences as Israelis, referring to it simply as members "speaking out of order." Yaniv Decl., Ex. B.

## ARGUMENT

### I. THE EVIDENCE IS SUFFICIENT TO PRECLUDE SUMMARY JUDGMENT ON COUNTS ONE AND THREE

In Counts One and Three of the Complaint, Dr. Yaniv asserts that the Union discriminated against her based on her status as an Israeli Jew, in violation of Title VII of the Civil Rights Act and the California Fair Employment and Housing Act ("FEHA"), respectively.[5] *See* Dkt. 1 at ¶¶ 128-134, 148-160. Under Title VII, it is unlawful for a labor organization "to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(c)(1). To make out a *prima facie* claim of discrimination against a union, a person must show that [1] she was a member of a protected class and "[2] was singled out [by the union] and treated less favorably than others similarly situated [3] on account of' their protected class." *Asing v. Hawaii Gov't Emps. Ass'n – AFSCME Loc. 152*, No. 24-3101, 2025 WL 1588732, *1 (9th Cir. June 5, 2025) (quoting *Beck v. UFCW Union, Loc. 99*, 506 F.3d 874 (9th Cir. 2007)). A plaintiff may establish a *prima facie* claim by showing "an inference of discrimination in whatever manner is appropriate in the particular circumstances." *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010). "A plaintiff may do so through comparison to similarly situated individuals, or any other circumstances 'surrounding the adverse employment action [that] give rise to an inference of discrimination.'" *Id.* (quoting *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 603 (9th Cir. 2004)). "The requisite degree of proof necessary to establish a prima facie case for Title VII…on summary judgment is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 889 (9th Cir. 1994). If a plaintiff establishes the *prima facie* case, then the burden shifts to the union to produce evidence that the actions were taken for legitimate, nondiscriminatory reasons. *Bergene v. Salt River Project Agr. Imp. & Power Dist.*, 272 F.3d 1136, 1141 (9th Cir. 2001). The burden then shifts back to the plaintiff to show that the union's proffered justification is pretextual. *Id.*

In this context, "summary judgment is not appropriate if, based on the evidence in the

---

[5] The same analytical framework applies to discrimination claims under Title VII and FEHA, and courts construe the statutes together. *McEntee v. Santa Clara Cnty. Office of Educ.*, 25-cv-08008, 2026 WL 2109533, *2 (N.D. Cal. 2026) (citing *Earl v. Nielsen Media Research, Inc.*, 658 F.3d 1108, 1112 (9th Cir. 2011)). Thus, a claim substantiated under Title VII is also substantiated under FEHA.

record, a reasonable jury could conclude by a preponderance of the evidence that the defendant undertook the challenged employment action because of" the plaintiff's protected characteristic. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006). The plaintiff's claim survives summary judgment where, for example, she offers evidence, "direct or circumstantial, 'that a discriminatory reason more likely motivated the employer' to make the challenged employment decision'" or "that the employer's proffered explanation is unworthy of credence.'" *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

**A. Based on the Evidence in the Record, Dr. Yaniv Can Make Out a Prima Facie Claim that the Union Discriminated Against Her Because She Is Israeli**

The Union does not dispute that Dr. Yaniv, who is an Israeli citizen, is a member of a protected class. Therefore, there is no question that the first element of a disparate treatment claim is satisfied here. Additionally, the Union does not dispute that Dr. Yaniv experienced the adverse actions that are discussed below. Therefore, the only questions are whether the Union singled out Dr. Yaniv and treated her less favorably than others "similarly situated" and whether that treatment was based on her status as a member of a protected class. The evidence shows that Dr. Yaniv satisfies both of those elements.

**i. The record contains sufficient evidence that the Union singled out Dr. Yaniv and treated her less favorably than other people who were situated similarly to her**

Contrary to the Union's arguments, the evidence shows that it sought to exclude or hinder only Dr. Yaniv and other Israelis from full participation in meetings and BDS activities.

In the December 15, 2023 meeting between Dr. Yaniv, Dr. Shimoni, and the Union, Ms. Cook and Mr. Weitz openly admitted that Union officials singled out and excluded Israelis from participating in its actions that concerned the Israeli-Palestinian conflict, in order to avoid "normalizing" Israeli participation. Shimoni Depo. 20:11-21:24, Exhibit 1. Notably, the Union has not presented any evidence to dispute this fact. Instead, the Union refused to take steps to address the concerns Israelis expressed. Shimoni Depo. 33:21-34:6, 34:19-35:2; Jaime Depo. 55:12-56:5.

The Union also repeatedly changed its rules to create roadblocks for Israeli participation in its affairs. For example, Ms. Arveson told Dr. Yaniv that anyone who wanted to meet with Union officials needed to become a dues-paying member first. She then responded with "oh shit" when

Dr. Yaniv joined the Union. Yaniv Depo. 68:11-70:25; Yaniv Decl., Ex. A; Vaitl Decl., Ex. E, F. The Union also changed its rules to interfere with a proposal that Dr. Yaniv and Dr. Shimoni wanted to present at the January membership meeting. Shimoni Depo. 82:3-84:6. Dr. Shimoni followed Mr. Chowdhury's instructions for making a proposal to the Union. But the Union later blocked her from presenting her proposal during the meeting, claiming that she needed to first garner support from other members and engage in an indefinite back-and-forth with its leaders. Shimoni Depo. 82:11-16.

Later, the Union imposed a new requirement that forced its members who attended membership meetings virtually to show their faces before being able to speak during the meetings. Yaniv Decl. ¶¶ 8-11. This requirement was not part of the Union's membership meeting protocol and was not imposed on members who spoke in support of Palestinians or criticized Israel and Israelis. Yaniv Decl. ¶ 8 & Ex. C. Rather, Mr. Chowdhury *interrupted* Ms. Nidam to impose the new rule *while* she spoke about her experiences as an Israeli, such that she was forced to show her face to continue speaking. *Id.* ¶ 9. And the Union implemented this requirement despite knowing that the meetings were hostile toward Israelis. Yaniv Decl. ¶¶ 8-11 & Ex. B; Vaitl Decl., Ex. K.

In fact, the singling out and hostile treatment of Israelis during Union membership meetings was evident from the first meeting Dr. Yaniv attended. During the January 2024 meeting, Dr. Yaniv and Dr. Shimoni noticed that other members, whom they had never met, already knew their names and status as postdoctoral employees. Yaniv Depo. 62:5-9; Shimoni Depo. 59:11-60:5. The meeting was hostile and intimidating to Dr. Yaniv and Dr. Shimoni, to the degree that Dr. Shimoni did not feel comfortable trying to gather support for her proposal from other members. Shimoni Depo. 84:1-6. Ms. Arveson and Mr. Weitz privately acknowledged that the meeting was hostile and suggested that the atmosphere was desirable. *See* Vaitl Decl., Ex. K. (text from Ms. Arveson stating, "Neta and Karin gonna leave the union before we even start talking about Palestine with this crowd," to which Mr. Weitz replied, "I can't work miracles."). *See also* Weitz Depo. 87:6-24, Ex. 11. Given what they experienced at the January meeting, Dr. Yaniv and Dr. Shimoni subsequently did not attend Union meetings in person. Yaniv Decl. ¶ 6; Shimoni Depo. 101:13-103:3.

The membership meetings in March and April 2024 followed the same pattern. During the March meeting, Dr. Shimoni spoke about her experience as an Israeli and how the Union's actions

made her feel alienated and discriminated against, which prompted other members to harass and "boo" her as she spoke. Shimoni Depo. 43:11-44:18, Ex. 5. Dr. Yaniv witnessed this treatment. Yaniv Decl. ¶ 7. As these events occurred, Union leaders were present and yet did nothing more than ask members to keep order. Shimoni Depo. 44:19-45:11. Similarly, during the April meeting, Ms. Nidam introduced herself as an Israeli and a peace activist and spoke about her family members who had been killed by Hamas. Nidam Depo. 23:11-19. Union members mocked and laughed at her. Nidam Depo. 18:11-15, 19:15-24; Yaniv Depo. 122:2-123:5; Yaniv Decl. ¶ 9. The interruptions were so disruptive that Ms. Nidam could not finish her remarks. Nidam Depo. 22:11-16. While Ms. Nidam was speaking, one member, who was participating in the meeting remotely, wrote "LMFAOO" in the meeting's Zoom chat. Shimoni Depo. 68:2-6; Yaniv Depo. 122:2-123:5. Once Ms. Nidam stopped speaking, a member stated that, as an Israeli, Ms. Nidam had no right to an opinion on the Israeli-Palestinian conflict and proposed BDS efforts. Nidam Depo. 18:11-15, 19:15-24; Yaniv Decl. ¶ 9. Members made those types of comments throughout the meeting, every time that Ms. Nidam tried to speak. Nidam Depo. 22:2-16. None of the Union leaders who were attending the meeting ever told the people who were making those comments to stop doing so. Nidam Depo. 39:25-40:6. The treatment of Israelis who were speaking about their experiences *as Israelis* stood in stark contrast to how speakers who were *not* of Israeli national origin were treated in the same meetings. Shimoni Depo. 43:24-44:4, 65:2-23; Nidam Depo. 22:21-24:1.

The Union ignores the evidence that is discussed above and, instead, emphasizes the number of meetings that Union officials had with Israelis and the fact that Dr. Yaniv had an opportunity to express her views at its meetings. Def.'s Br. at 29. But, while it is true that officials met with Dr. Yaniv and others, and that Israelis were not physically barred from attending and speaking at the meetings, the Union ignores the reality of what took place. First, the Union ignores the undisputed fact that its leaders adopted an anti-normalization approach to exclude Israelis, ***as Israelis***, from participating in its Israeli-Palestinian activities, then took the actions that are described above. The officials' meetings with Israelis, in other words, were meaningless, and a reasonable juror could conclude that the Union's initial willingness to meet with them was a false front that was meant to placate a group that it otherwise intended to marginalize. Additionally, there is no dispute that Union

membership meetings were hostile toward Israelis, and that Union officials, at least privately, acknowledged the hostility. The Union, in other words, allowed Israelis to participate in its meetings, but only under hostile conditions that did not apply to anyone else who participated in the meetings. And, a reasonable juror could conclude that the Union permitted the hostility toward Israelis while knowing that many, if not all, of them would eventually resign from its membership ranks, and that it would achieve its goal of excluding Israelis without having to do so overtly.

When considered collectively, the events that are described above give rise to a reasonable inference that the Union, despite creating the appearance that it was listening to Dr. Yaniv and other Israelis, was motivated to *deter* the inclusion of and additional dialogue with them, not encourage it. Again, that inference is consistent with the Union's early admission that it was intentionally excluding Israelis, as Israelis, from participating in its response to the Israeli-Palestinian conflict.

This type of tactic repeated itself in the BDS EC, where Dr. Yaniv and Dr. Shimoni were excluded from full participation. Committee members initially tried to have them expelled from the committee, before Dr. Shimoni confronted them about the fact that they were trying to expel only the committee's two Israeli members. Shimoni Depo. 86:8-22. Committee members, as a result, shifted their tone toward excluding people who would "disrupt" the work of the committee. *Id.* There is no evidence that Dr. Yaniv or Dr. Shimoni ever tried to disrupt the work of the committee, so the committee again shifted tactics and excluded them from the subcommittees, where all of its work was performed, which made it impossible for them to contribute to the work effectively. [redacted] Depo. 59:6-9, 61:22-25, 65:3-7, 74:14-75:23; Shimoni Depo. 80:5-81:17. The BDS EC made no effort to exclude anyone else from participating in its affairs. [redacted] Depo. 53:4-7.

The Union states that there is no evidence that any member of the Structure Subcommittee "was informed of its work plans before [Dr. Yaniv] was" and argues that she was able to fully participate in the subcommittee. *See* Def.'s Br. at 11, 30. This assertion is demonstrably false. Mr. [redacted], who oversaw the Structure Subcommittee, acknowledged that he intentionally kept Dr. Yaniv uninformed about the subcommittee's activities so that she would not be able to contribute effectively to its work. [redacted] Depo. 74:14-75:23. Further, contrary to the Union's argument that the subcommittee members worked only on their own time, Mr. [redacted] testified that he used a

group chat—from which he intentionally excluded Dr. Yaniv—to coordinate the subcommittee's work and schedule its meetings. [redacted] Depo. 59:6-9, 61:3-62:10, 62:23-63:1, 65:3-7, 67:22-69:7.

Based on the evidence that is discussed above, a reasonable juror could conclude that Dr. Yaniv was singled out and treated differently, and worse, than other people who were situated similarly to her.

**ii. The record contains sufficient evidence that the Union treated Dr. Yaniv differently, and worse, than similarly-situated people because she is Israeli**

The record also contains evidence that Dr. Yaniv's adverse treatment was based on her status as a member of a protected class, namely, her status as a person of Israeli national origin. In addressing Dr. Yaniv's disparate treatment claims, the Union does not address this factor. However, in its argument relating to the hostile environment claim, the Union contends that the actions that it took against Dr. Yaniv and other Israelis were based on differences in political views, rather than national origin. Def.'s Br. at 21-22. But here, too, the Union fails to account for the full picture. In particular, in making its argument, the Union fails to account for the following facts:

(1) Mr. Weitz and Ms. Cook admitted that Union leaders excluded Israelis from its activities, *as Israelis*, in the name of "anti-normalization." Shimoni Depo. 20:11-21:24, Exhibit 1.

(2) Union leaders sought to stop meetings with Israelis by refusing to meet with anyone who was not one of its dues-paying members, only to respond negatively when Dr. Yaniv became such a member. Yaniv Depo. 68:11-70:25; Yaniv Decl., Ex. A; Vaitl Decl., Ex. E, F.

(3) Union leaders imposed new obligations that Dr. Shimoni had to satisfy before she was permitted, during the January 2024 membership meeting, to present a proposal regarding ideas to promote peace and cooperation between Palestinians and Israelis. Shimoni Depo. 82:3-84:6. And, the Union then allowed—or even engineered—the January meeting to become so hostile towards Israelis that Dr. Shimoni did not feel comfortable pursuing her proposal under the new rules that it had imposed. Shimoni Depo. 84:1-6.

(4) Members repeatedly shouted that Ms. Nidam, *as an Israeli*, had no right to an opinion, and Union leaders did nothing to stop the harassment. Nidam Depo. 18:11-15, 19:15-24.

(5) Members booed or mocked Dr. Shimoni and Ms. Nidam after they spoke about their

experiences *as Israelis*, while Union leaders took no meaningful action to protect them, Shimoni Depo. 43:11-45:11; Nidam Depo. 18:11-15, 19:15-24, 22:2-16, 39:25-40:6.

(6) The Union imposed new restrictions on meeting participation while Ms. Nidam spoke about her experiences, *as an Israeli*. Specifically, the Union refused to allow anyone who was attending a meeting virtually to speak during the meeting without showing their face. This maneuver silenced Dr. Yaniv, Ms. Nidam, and other Israelis, who were concerned about showing their faces in a hostile environment. Yaniv Decl. ¶¶ 8-11.

(7) The BDS EC sought to remove Dr. Yaniv and Dr. Shimoni from its membership ranks, purportedly because they spoke critically of BDS, but did not vet any of its other members in the same manner. [redacted] Depo. 53:4-7.

The Union ignores each of these facts illustrating differential treatment of Dr. Yaniv and other Israelis. Those undisputed facts give rise to an inference of unlawful, national origin-based discrimination, *Hawn*, 615 F.3d at 1156, and a reasonable juror could conclude that Dr. Yaniv experienced adverse treatment *because* she is Israeli. Further, the Union's "anti-normalization" principle explicitly sought to exclude Israelis on the basis of their national origin. The existence of these facts is sufficient to defeat summary judgment. *See Raad v. Fairbanks North Star Borough Sch. Dist.*, 323 F.3d 1185, 1196 (9th Cir. 2003) (holding evidence sufficient to raise inference of discrimination where record showed that defendant's decision to discipline plaintiff for purported bomb threat was influenced by stereotypes about her religion or nationality).

Rather than addressing these facts, the Union relies on facts that are in dispute and attempts to sidestep the discrimination question entirely by asserting that the adverse-to-Israeli actions were taken by "rank and file" members who did not act with its authority. For example, the Union attempts to minimize the January BDS Resolution as something that was "co-authored by rank-and-file Union members" and "not an official Union resolution." Def.'s Br. at 10. But Mr. Chowdhury referred to the BDS EC as a "union space" and, later, a "union [working group]." Chowdhury Depo., Ex. 6 at 6, 11. Relatedly, the Union fails to explain why it is relevant that the January BDS Resolution was "co-authored by rank-and-file Union members," particularly when Mr. Jaime testified that members can propose resolutions and are the ultimate authority within the Union.

Jaime Depo. 29:2-4, 31:4-13. Moreover, the Union did not disclaim the resolution, Jaime Depo. 47:14-22, and its officials, including Mr. Chowdhury, were aware of the discriminatory actions that the BDS EC carried out. Chowdhury Depo., Ex. 6 at 4-11. In response to learning that the BDS EC was attempting to exclude Dr. Yaniv and Dr. Shimoni, Mr. Chowdhury even stated that, "if [[redacted]] is nominally in charge, we need to sit down w[ith] him and talk to him about how a union w[orking] g[roup] has to run," Chowdhury Depo., Ex. 6 at 11,[6] yet never did so. [redacted] Depo. 45:23-46:11.

The Union also argues that Mr. [redacted] excluded Dr. Yaniv from the Structure Subcommittee's group chat because he thought that she would disrupt the subcommittee's work. Def.'s Br. at 22. Although Mr. [redacted] claimed that he excluded Dr. Yaniv from the group chat because she might interfere with the subcommittee's work and "dox" its members, he also acknowledged that he had no reason to think that she would "dox" anyone. [redacted] Depo. 75:7-23. And, as noted above, there is no evidence that Dr. Yaniv tried to interfere with or disrupt the BDS EC's work. Further, the individuals who participated in the subcommittee were part of the broader BDS EC, and there is no question that Dr. Yaniv attended meetings of that broader committee. These inconsistencies in Mr. [redacted]' testimony give rise to credibility questions that this Court cannot resolve in deciding a motion for summary judgment. *Gessele*, 174 F.4th at 1122 ("[C]ourts cannot decide which witnesses are credible at summary judgment."). Similarly, the Union argues that there is no evidence that Mr. Weitz acknowledged Dr. Yaniv's exclusion from the subcommittee and cites his deposition testimony in support of that argument. Def.'s Br. at 11. Dr. Yaniv's testimony, however, contradicts Mr. Weitz's testimony on this issue. Yaniv Depo. 100:19-101:10. Far from being undisputed, question of fact is one that depends on a credibility determination. *Gessele*, 174 F.4th at 1122.

Based on this evidence, it follows that, under both Title VII and FEHA, Dr. Yaniv has made

---

[6] The Union's tendency to blame rank-and-file members for things that are, in fact, attributable to *it* constitutes another example of its efforts to sanitize its conduct. As noted above, the Union engaged in this same practice with respect to the Union Village. The Union claims that the Union Village that was formed within the Gaza encampment on the Berkeley campus cannot be attributed to it. Def.'s Br. at 9. However, Mr. Chowdhury, in a speech that he gave at a rally in which he identified himself as a Union official, stated that the Union stood ready "to defend" the encampment. Chowdhury Depo. 35:21-36:2, 39:12-22, 40:4-7. After the rally, Mr. Chowdhury, along with Rosenblum-Sellers, even spoke with a reporter about the Union Village. Chowdhury Depo. 43:8-45:3, Ex. 7.

out a *prima facie* claim that the Union discriminated against her because she is Israeli.

**iii. The Union's discrimination served to diminish its performance as an exclusive representative**

The Union separately argues that, to make out a claim for discrimination under Title VII, Dr. Yaniv must show that it discriminated against her in its capacity as her exclusive representative. Def.'s Br. at 26-27. In making this argument, however, the Union largely relies on decisions that address union liability for *workplace* discrimination. Here, the issue is *not* workplace discrimination, but rather discrimination that took place in *Union* spaces. Courts have recognized that a union's discrimination in its own spaces can give rise to a cognizable claim under Title VII. *See*, *e.g.*, *Dixon v. Int'l Broth. of Police Officers*, 504 F.3d 73 (1st Cir. 2007) (applying Title VII to "discrimination within the union, by union members (including members of the Local's executive board), under the supervision and acquiescence of the Local's president"); *Daggitt v. UFCW Int'l Union Loc. 304A*, 59 F. Supp. 2d 980, 984 (D.S.D. 1999) (denying motion for summary judgment on Title VII claim where plaintiff produced sufficient evidence that union engaged in gender discrimination in union spaces).

Even assuming, *arguendo*, that Dr. Yaniv must show a connection between the Union's conduct and its role as her exclusive representative, the record contains sufficient evidence to raise a triable question of fact on that topic. First, much of the conduct took place in the BDS EC, which was formed for the very purpose of establishing the priorities that the Union would advance in its collective bargaining with Berkeley—the very essence of its agent function. Further, it is well-established that the Union, in exercising its rights as the exclusive representative, has a corresponding legal obligation "to serve the interests of all members without hostility or discrimination[.]" *Demetris v. Transp. Workers Union*, 862 F.3d 799, 804 (9th Cir. 2017) (quoting *Vaca v. Sipes*, 386 U.S. 171, 177 (1967)). By embracing the "anti-normalization" concept, excluding Israelis from some of its spaces, and allowing hostility toward Israelis that was severe enough to prompt some of them to drop from its membership ranks, the Union sent a clear message that it was not, in fact, committed to serving the interests of *all* members. In other words, the Union knowingly created an environment in which certain members, on account of their national origin, did not feel welcome. Yaniv Depo. 59:9-13, 98:20-25, 135:18-136:1, 145:17-22, 161:25-162:3. In doing so, the Union's conduct caused Dr. Yaniv and others to silence themselves at times, or avoid asking for its

representation out of a predictable fear that it would not act in their best interests. *See*, *e.g.*, Yaniv Depo. 49:5-12; Shimoni Depo. 39:5-40:15. This approach inherently impacted the terms and conditions of Dr. Yaniv's employment because the Union—the entity that was granted the exclusive right to represent her with respect to the terms and conditions of her employment—demonstrated that it disfavored her because of her Israeli national origin.

### B. The Union's Proffered Justification for the Disparate Treatment Is Pretextual

In addressing Dr. Yaniv's disparate treatment claims, the Union does not explicitly state a legitimate, non-national origin-based reason for its conduct. However, the Union seems to claim that its actions were merely an outgrowth of a political dialogue. Based on the facts that are discussed above, however, a reasonable juror could conclude otherwise. As noted above, the Union admitted to pursuing an exclusionary agenda against Israelis, seeking to keep them sidelined. Shimoni Depo. 20:11-21:24, Ex. 1. That same agenda is evident in its subsequent actions with respect to Israeli participation in Union activities. And, for purposes of showing a pretext in the summary judgment context, "very little evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a fact-finder." *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1124 (9th Cir. 2004); *see also id.* (quoting *Sischo-Nownejad v. Merced Cmty. Col. Dist.*, 934 F.2d 1104, 1111 (9th Cir.) ("We require very little evidence to survive summary judgment precisely because the ultimate question is one that can only be resolved through a 'searching inquiry' – one that is most appropriately conducted by the fact finder, upon a full record.")). Here, the Union's "anti-normalization" agenda, and the way that agenda informed and permeated its subsequent actions, many of which are catalogued above, is an indication of discriminatory motive that is sufficient to defeat summary judgment.

## II. THE EVIDENCE IS SUFFICIENT TO PRECLUDE SUMMARY JUDGMENT ON COUNT TWO

In Count Two of the Complaint, Dr. Yaniv asserts that the Union created a hostile environment for her because of her status as an Israeli Jew. Under Title VII, a hostile environment exists where "discriminatory intimidation, ridicule, and insult" is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."

*National* R.R. *Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002). To prevail on a hostile environment claim, a plaintiff must show that the pertinent environment was both subjectively and objectively hostile. *McGinest v. GTE Serv. Corp.*, 360 F.3d 103, 1113 (9th Cir. 2004). In determining whether an environment is objectively hostile, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Nichols v. Azteca Rest. Enters., Inc.*, 256 F.3d 864, 872 (9th Cir. 2001)). Additionally, courts must consider an environment's objective hostility from the perspective of a reasonable member of the relevant protected class. *Id.* 1116.

In assessing a hostile environment claim, moreover, courts must consider all relevant evidence, including evidence, such as protected speech, that might otherwise be outside the reach of Title VII. "[C]ourts have long recognized that there is no 'constitutional problem with using . . . offensive speech as evidence of motive or intent'" in order to prove that harassment or hostility was motivated, at least in part, by a protected characteristic. *Gartenberg v. Cooper Union for the Advancement of Sci. & Art*, 765 F. Supp. 3d 245, 266 (S.D.N.Y. 2025) (quoting *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 208 (3d Cir. 2001)). "Accordingly, when a hostile environment claim is based on both protected speech and unprotected conduct, a court must still consider the entire record in determining whether the harassment was discriminatory in nature." *Id.*[7]

As discussed below, based on all of the relevant evidence, there is a triable question of fact as to Dr. Yaniv's hostile environment claim and summary judgment on that claim is improper.

### A. Under Title VII, Unions Can Be Liable for Creating Hostile Environments

As an initial matter, the Union suggests that Dr. Yaniv's hostile environment claim should fail, as a matter of law, because courts do not recognize such claims against unions. *See* Def.'s Br. at 14. Although there is some disagreement among the district courts on this topic, circuit courts have generally allowed such claims. For example, in *Dowd v. United Steelworkers, Local No. 286*, the Eighth

[7] For this reason, this Court should disregard the Union's contention that certain evidence should not be considered because it relates to protected speech. Def.'s Br. at 16-20. Even if some speech cannot, itself, form the basis of a Title VII claim because it is protected by the First Amendment, that speech remains relevant to the analysis of the claim and must be considered accordingly.

Circuit considered Title VII's pronouncement that it is unlawful for a union "to exclude or to expel from its membership, *or otherwise to discriminate against*, any individual because of his race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(c)(1) (emphasis added), and determined that "the plain language of the statute suggests that unions may be liable for any discrimination, including a claim of hostile work environment." 253 F.3d 1093, 1102 (8th Cir. 2001). *See also Angelino v. New York Times Co.*, 200 F.3d 73, 95-96 (3d Cir. 1999); *cf. Phillips v. UAW Int'l*, 854 F.3d 323, 326-27 (6th Cir. 2017). The Union, in fact, expressly *acknowledges* that courts allow for hostile environment claims against unions. Def.'s Br. at 15. There is simply no merit to the Union's argument that Dr. Yaniv cannot bring a hostile environment claim at all.

### B. The Record Contains Sufficient Evidence of Discriminatory Intimidation, Ridicule, or Insult

The starting point for assessing a hostile environment claim is to determine if discriminatory intimidation, ridicule, or insult was present. *National R.R. Passenger Corp.*, 536 U.S. at 116. Here, as discussed at length above, the record contains ample evidence to create a triable issue of fact.

In particular, the Union made clear as early as December 2023 that it intended to marginalize Israelis, as Israelis, and exclude them from participating in the formulation of its response to the October 7 Attack. Shimoni Depo. 20:11-21:24, Exhibit 1. This anti-Israeli agenda carried forward into both general Union membership meetings and meetings of the BDS EC. The January 2024 membership meeting was so hostile that Ms. Arveson thought that Dr. Yaniv and Dr. Shimoni might immediately quit the Union. Vaitl Decl., Ex. K. At both the March and April 2024 Union membership meetings, both of which Dr. Yaniv attended, members "booed," mocked, and laughed at Dr. Shimoni and Ms. Nidam while they spoke about their experiences as Israelis. Shimoni Depo. 43:11-44:18, 68:2-6; Nidam Depo. 18:11-15, 19:15-24; Yaniv Depo. 122:2-123:5. Throughout the April meeting, whenever Ms. Nidam spoke, members shouted that she had no right to an opinion because she is an Israeli. Nidam Depo. 18:11-15, 19:15-24. Union officials took no meaningful action to stop this conduct. Shimoni Depo. 44:19-45:11; Nidam Depo. 39:25-40:6.

The January BDS Resolution, moreover, expressly committed "to protecting all workers at the University of California facing harassment or retaliation for their Palestinian identity or advocacy," without making any commitment to protect workers from harassment or retaliation

based on their Israeli or Jewish identities. Yaniv Depo., Ex. 4. In the BDS EC's first meeting, fellow committee members targeted Dr. Yaniv and Dr. Shimoni, accused them of bad faith, and sought to exclude them from the committee. Shimoni Depo. 86:8-22. No other members of the committee faced the same treatment. [redacted] Depo. 53:4-7.

Although some of this treatment was directed at Israelis other than Dr. Yaniv, such as Dr. Shimoni and Ms. Nidam, it nevertheless lends support to the notion that the Union's hostility toward Dr. Yaniv was based on her national origin, and was pervasive. *See EEOC v. Village At Hamilton Pointe LLC*, 103 F.4th 387, 402-403 (7th Cir. 2024) (stating that incidents directed at individuals other than plaintiff "still constituted evidence that the same supervisors made racially derogatory comments to other employees in the same positions and therefore, this evidence tended to make it more likely that the discrimination was pervasive").

The Union does not dispute that any of these things occurred. Thus, the record contains undisputed evidence of discriminatory intimidation, ridicule, or insult.

### C. The Record Contains Sufficient Evidence That the Anti-Israeli Discriminatory Behavior Was Severe and Pervasive

In assessing a hostile environment claim and whether hostility is severe and pervasive, courts consider discriminatory incidents collectively, not independently. *Pringle v. Wheeler*, 478 F. Supp. 3d 899, 914 (N.D. Cal. 2020). No minimum number of incidents is required; indeed, if it is severe enough, even a single incident can suffice. *Brooks v. City of San Mateo*, 229 F.3d 917, 925 (9th Cir. 2000). In this context, severity and pervasiveness operate inversely to one another. *Id.* Further, as noted above, courts must consider the hostility from the perspective of a reasonable member of the relevant protected class. *McGinest*, 360 F.3d at 1116. Here, the record contains sufficient evidence to create a triable issue of fact on this element of Dr. Yaniv's claim.

As detailed above in Argument § I.A, from December 2023 to April 2024, Dr. Yaniv and other Israelis faced persistent hostility in official Union spaces. The hostility emanated from both Union officials and members, who targeted them because of their Israeli national origin. The Union, after all, had embraced the "anti-normalization" principle. Shimoni Depo. 20:11-21:24, Exhibit 1. Dr. Yaniv and other Israelis were made to feel so unwelcome that some of them opted to revoke their membership in the Union specifically because of the actions and inaction of the officials.

Nidam Depo. 24:14-23; Shimoni Depo. 70:14-71:2, Ex. 6; Yaniv Depo. 130:24-131:8. There is evidence that this phenomenon was by design, as illustrated by a conversation between Ms. Arveson and Mr. Weitz. During that conversation, Ms. Arveson stated that the hostility would cause Dr. Yaniv and Dr. Shimoni to resign from the Union and Mr. Weitz, in response, stated that he "can't work miracles." Vaitl Decl., Ex. K. This same hostility was present in subsequent Union meetings, too. Dr. Yaniv and others could not speak up during the meetings to explain how events were impacting them as Israelis, without facing immediate backlash, verbal attacks, and ridicule. Shimoni Depo. 43:11-44:18, 68:2-6; Nidam Depo. 18:11-15, 19:15-24; Yaniv Depo. 122:2-123:5.

When Dr. Yaniv and Dr. Shimoni joined the BDS EC, the hostility continued there. During the first BDS EC meeting, members were immediately hostile toward Dr. Yaniv and Dr. Shimoni, accused them of attending the meeting in bad faith, and ultimately tried to exclude them from the committee. Shimoni Depo. 86:8-22. Committee leaders, in turn, made it difficult, if not impossible, for them to effectively contribute to the committee's work. [redacted] Depo. 74:14-75:23; Shimoni Depo. 80:5-81:17. The hostility was severe and pervasive enough that Dr. Yaniv and others found it safer to remain silent and avoid asking for the Union's representation, out of a predictable fear that it would not act in their best interests. *See, e.g.*, Yaniv Depo. 49:5-12; Shimoni Depo. 39:5-40:15. Considering these incidents collectively, a reasonable juror could conclude that the discriminatory hostility was both subjectively and objectively severe and pervasive enough to substantiate this element of Dr. Yaniv's hostile environment claim.

### D. The Record Contains Sufficient Evidence that the Union's Hostility Affected the Terms and Conditions of Dr. Yaniv's Employment

Finally, to substantiate a hostile environment claim, a plaintiff must show that the hostility "alter[ed] the conditions of the victim's employment and create[d] an abusive working environment." *National R.R. Passenger Corp.*, 536 U.S. at 116. The Union argues that Dr. Yaniv's "has not alleged that she was subjected to harassment which altered the terms, conditions, or privileges of her employment there[.]" Def.'s Br. at 15. The Union is mistaken. Dr. Yaniv has, in fact, *alleged* a connection between the hostile environment that the Union created and her work life. *See, e.g.*, Complaint, Dkt. 1, at ¶¶ 93, 111-117. And the Union appears to construe "working environment" too narrowly, as the Eighth Circuit cautioned against in *Dowd*: "The offensive conduct does not

necessarily have to transpire at the workplace in order for a juror reasonably to conclude that it created a hostile working environment." *Dowd*, 253 F.3d at 1102. As discussed above, *supra* § I.A.iii, the Union's discrimination against Dr. Yaniv necessarily degraded its representation of her.

The Union's response to the hostility within its own spaces also was inadequate. Union leaders asked members to maintain order, but the harassment continued from one Union meeting to the next, and even repeatedly within the same meeting. Shimoni Depo. 44:19-45:11; Nidam Depo. 22:2-16. Thus, Union leaders knew in real time that their reminders were not effective, and still took no further action. And, in some cases, Union leaders did not take any action at all. Nidam Depo. 39:25-6. *See Bohnert v. Roman Catholic Archbishop of San Francisco*, 136 F. Supp. 3d 1094, 1123 (N.D. Cal. 2015) (denying summary judgment where, among other things, defendant "did not appear to learn from, or respond to, each instance of harassing conduct or to prevent similar occurrences in the future"). As a result of the Union's "anti-normalization" agenda, and its inadequate response to hostility within its spaces, Dr. Yaniv and other Israelis found it safer to remain silent and avoid asking it for representation. *See*, *e.g.*, Yaniv Depo. 49:5-12; Shimoni Depo. 39:5-40:15.

A reasonable juror could therefore find that the Union's hostility impacted the terms and conditions of Dr. Yaniv's employment.

## III. THE UNION HAS NOT SHOWN THAT IT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT FOUR

In Count Four, Dr. Yaniv alleges that the Union violated Cal. Gov't Code 12940(k) by failing to prevent discrimination. The Union's only argument regarding that Count is that Dr. Yaniv has not produced evidence of discrimination. However, as shown above, the record contains more than enough evidence for a reasonable juror to conclude that the Union discriminated against Dr. Yaniv because of her Israeli national origin. The Union has not presented any other basis for granting summary judgment on Count Four.

## CONCLUSION

Based on the evidence discussed above, for each Count in the Complaint, there are genuine issues of material fact—particularly with regard to the Union's motives and intent in carrying out its actions that were adverse to Dr. Yaniv. The Court should deny the Motion in its entirety.

Dated: September 11, 2026

Respectfully Submitted,

By: */s/ Jonathan R. Vaitl*

Jonathan R. Vaitl
Attorney for Plaintiff Karin Yaniv